# UNITED STATES *v.* MOORE

No. 74–759.  Argued October 7, 1975—Decided December 9, 1975

POWELL, J., delivered the opinion for a unanimous Court.

*Paul L. Friedman* argued the cause for the United States. With him on the briefs were *Solicitor General Bork, Assistant Attorney General Thornburgh, Acting Assistant Attorney General Keeney,* and *Sidney M. Glazer.*

*Raymond W. Bergan* argued the cause for respond-

123

ent. With him on the brief were *Edward Bennett Williams* and *Harold Ungar*.

MR. JUSTICE POWELL delivered the opinion of the Court.

The issue in this case is whether persons who are registered under the Controlled Substances Act (CSA or Act), 84 Stat. 1242, 21 U. S. C. § 801 *et seq.*, can be prosecuted under § 841 for dispensing or distributing controlled substances. The United States Court of Appeals for the District of Columbia Circuit reversed the conviction of respondent, a licensed physician registered under the Act, on the ground that he was exempted from prosecution under § 841 by virtue of his status as a registrant. We reverse and hold that registered physicians can be prosecuted under § 841 when their activities fall outside the usual course of professional practice.

## I

Dr. Moore was charged, in a 639-count indictment, with the knowing and unlawful distribution and dispensation of methadone (Dolophine), a Schedule II controlled substance,[1] in violation of 21 U. S. C. § 841 (a)(1). That subsection provides:

"Except as authorized by this subchapter, it shall be unlawful for any person knowingly or intentionally—

"(1) to manufacture, distribute, or dispense, or

---

[1] A substance listed in Schedule II has "a high potential for abuse," "a currently accepted medical use in treatment in the United States or a currently accepted medical use with severe restrictions," and is a drug the abuse of which "may lead to severe psychological or physical dependence." 21 U. S. C. § 812 (b)(2). Methadone is listed as a Schedule II drug in § 812 (c), Schedule II (b)(11).

possess with intent to manufacture, distribute, or dispense, a controlled substance . . . ."

The indictment covered a 5½-month period from late August 1971 to early February 1972. It was reduced before trial to 40 counts, and the jury convicted respondent on 22 counts. He was sentenced to concurrent terms of five to 15 years' imprisonment on 14 counts, and to concurrent terms of 10 to 30 years on the remaining eight counts. The second set of sentences was to be consecutive with the first. Fines totaling $150,000 were also imposed.[2]

Methadone is an addictive drug used in the treatment of heroin addicts. If taken without controls it can, like heroin, create euphoric "highs," but if properly administered it eliminates the addict's craving for heroin without providing a "high." The two principal methods of treating heroin addicts with methadone are "detoxification" and "maintenance." Under a maintenance program, the addict is given a fixed dose once a day for an indefinite period to keep him from using heroin. In detoxification the addict is given a large dose of methadone during the first few days of treatment to keep him free of withdrawal symptoms. Then the dose is gradually reduced until total abstinence is reached.

Maintenance is the more controversial method of treatment. During the period covered by the indictment, registration under § 822, in itself, did not entitle a physician to conduct a maintenance program. In addition to a § 822 registration, the physician who wished to conduct such a program was required to

---

[2] In addition, Dr. Moore's license to practice medicine was revoked pursuant to D. C. Code Ann. § 2–131 (1973), which authorizes revocation upon the conviction of "any felony." An appeal from the conviction acts "as a supersedeas to the judgment . . . revoking his license . . . ."

obtain authorization from the Food and Drug Adminis-
tration for investigation of a new drug. Dr. Moore's
authorization by the FDA was revoked in the summer
of 1971, and he does not claim that he was conducting
an authorized maintenance program. Instead, his de-
fense at trial was that he had devised a new method of
detoxification based on the work of a British practi-
tioner. He testified that he prescribed large quantities
of methadone to achieve a "blockade" condition, in which
the addict was so saturated with methadone that heroin
would have no effect, and to instill a strong psychological
desire for detoxification. The Government's position is
that the evidence established that Dr. Moore's conduct
was inconsistent with all accepted methods of treating
addicts, that in fact he operated as a "pusher."

Respondent concedes in his brief that he did not ob-
serve generally accepted medical practices. He conducted
a large-scale operation. Between September 1971 and
mid-February 1972 three District of Columbia pharma-
cies filled 11,169 prescriptions written by Dr. Moore.
These covered some 800,000 methadone tablets. On 54
days during that period respondent wrote over 100 pre-
scriptions a day. In billing his patients he used a
"sliding-fee scale" pegged solely to the quantity pre-
scribed, rather than to the medical services performed.
The fees ranged from $15 for a 50-pill prescription to $50
for 150 pills. In five and one-half months Dr. Moore's
receipts totaled at least $260,000.

When a patient entered the office he was given only
the most perfunctory examination. Typically this in-
cluded a request to see the patient's needle marks (which
in more than one instance were simulated) and an un-
supervised urinalysis (the results of which were regularly
ignored). A prescription was then written for the
amount requested by the patient. On return visits—for

which appointments were never scheduled—no physical examination was performed and the patient again received a prescription for whatever quantity he requested. Accurate records were not kept, and in some cases the quantity prescribed was not recorded. There was no supervision of the administration of the drug. Dr. Moore's instructions consisted entirely of a label on the drugs reading: "Take as directed for detoxification." Some patients used the tablets to get "high"; others sold them or gave them to friends or relatives. Several patients testified that their use of methadone increased dramatically while they were under respondent's care.[3]

The Court of Appeals, with one judge dissenting, assumed that respondent acted wrongfully but held that he could not be prosecuted under § 841.[4]    164 U. S.

---

[3] One patient testified that he was taking approximately two to three pills per day when he started visiting Dr. Moore. By the end of his visits he was taking 30 to 35 pills a day. App. 43. Another patient increased his intake from five to 10 pills a day to almost 70. *Id.*, at 53–54. A third addict, relying on Dr. Moore for drugs, increased his intake from seven pills a day to over 100. Tr. 310.

[4] Section 841 (a) provides, in full:
"Except as authorized by this subchapter, it shall be unlawful for any person knowingly or intentionally—

"(1) to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance; or

"(2) to create, distribute, or dispense, or possess with intent to distribute or dispense, a counterfeit substance."

"Dispense" is defined in § 802 (10) to mean "to deliver a controlled substance to an ultimate user . . . by, or pursuant to the lawful order of, a practitioner, including the prescribing and administering of a controlled substance . . . ." Section 802 (11) defines "distribute" to mean "to deliver (other than by administering or dispensing) a controlled substance." "Administer" refers to "the direct application of a controlled substance to the body of a patient . . . ." § 802 (2).

128

App. D. C. 319, 505 F. 2d 426 (1974). The court found that Congress intended to subject registered physicians to prosecution only under §§ 842 and 843,[5] which pre-

[5] Section 842 in relevant part provides:

"(a) Unlawful acts.

"It shall be unlawful for any person—

"(1) who is subject to the requirements of part C to. distribute or dispense a controlled substance in violation of section 829 of this title;

"(2) who is a registrant to distribute or dispense a controlled substance not authorized by his registration to another registrant or other authorized person or to manufacture a controlled substance not authorized by his registration;

"(3) who is a registrant to distribute a controlled substance in violation of section 825 of this title;

"(4) to remove, alter, or obliterate a symbol or label required by section 825 of this title;

"(5) to refuse or fail to make, keep, or furnish any record, report, notification, declaration, order or order form, statement, invoice, or information required under this subchapter or subchapter II of this chapter;

"(6) to refuse any entry into any premises or inspection authorized by this subchapter or subchapter II of this chapter;

"(7) to remove, break, injure, or deface a seal placed upon controlled substances pursuant to section 824 (f) or 881 of this title or to remove or dispose of substances so placed under seal; or

"(8) to use, to his own advantage, or to reveal, other than to duly authorized officers or employees of the United States, or to the courts when relevant in any judicial proceeding under this subchapter or subchapter II of this chapter, any information acquired in the course of an inspection authorized by this subchapter concerning any method or process which as a trade secret is entitled to protection.

"(b) Manufacture.

"It shall be unlawful for any person who is a registrant to manufacture a controlled substance in Schedule I or II which is—

"(1) not expressly authorized by his registration and by a quota assigned to him pursuant to section 826 of this title; or

"(2) in excess of a quota assigned to him pursuant to section 826 of this title."

scribe less severe penalties than § 841.[6] The court reasoned:

"... Congress intended to deal with registrants pri-

---

Section 843 provides:

"(a) Unlawful acts.

"It shall be unlawful for any person knowingly or intentionally—

"(1) who is a registrant to distribute a controlled substance classified in schedule I or II, in the course of his legitimate business, except pursuant to an order or an order form as required by section 828 of this title;

"(2) to use in the course of the manufacture or distribution of a controlled substance a registration number which is fictitious, revoked,. suspended, or issued to another person;

"(3) to acquire or obtain possession of a controlled substance by misrepresentation, fraud, forgery, deception, or subterfuge;

"(4) to furnish false or fraudulent material information in, or omit any material information from, any application, report, record, or other document required to be made, kept, or filed under this subchapter or subchapter II of this chapter; or

"(5) to make, distribute, or possess any punch, die, plate, stone, or other thing designed to print, imprint, or reproduce the trademark, trade name, or other identifying mark, imprint, or device of another or any likeness of any of the foregoing upon any drug or container or labeling thereof so as to render such drug a counterfeit substance.

"(b) Communication facility.

"It shall be unlawful for any person knowingly or intentionally to use any communication facility in committing or in causing or facilitating the commission of any act or acts constituting a felony under any provision of this subchapter or subchapter II of this chapter. Each separate use of a communication facility shall be a separate offense under this subsection. For purposes of this subsection, the term 'communication facility' means any and all public and private instrumentalities used or useful in the transmission of writing, signs, signals, pictures, or sounds of all kinds and includes mail, telephone, wire, radio, and all other means of communication."

[6] Violations of § 841, under which respondent was convicted, carry sentences of up to 15 years, fines as high as $25,000,

marily through a system of administrative controls, relying on modest penalty provisions to enforce those controls, and reserving the severe penalties provided for in § 841 for those seeking to avoid regulation entirely by not registering." 164 U. S. App. D. C., at 323, 505 F. 2d, at 430.

It said, further, that §§ 842 and 843 were enacted to enforce that scheme, while § 841 was reserved for prosecution of those outside the "legitimate distribution chain." Persons registered under the Act were "authorized by [the] subchapter" within the meaning of § 841 and thus were thought to be immunized against prosecution under that section.[7]

or both. § 841 (b). Knowing violators of § 842 are subject at most to imprisonment for one year, a fine of $25,000, or both. There also may be a civil penalty of $25,000 for violation of § 842. § 842 (c). The penalties for violation of § 843 are imprisonment for not more than four years, a fine of not more than $30,000, or both. § 843 (c). All three sections impose higher penalties for violations after the first conviction.

[7] The decision below stands alone. At the time it was issued it conflicted with the rulings of four other Circuits. Courts of Appeals for the First, Fifth, and Tenth Circuits had held squarely that physicians may be prosecuted under § 841. See *United States* v. *Badia,* 490 F. 2d 296 (CA1 1973); *United States* v. *Collier,* 478 F. 2d 268 (CA5 1973); *United States* v. *Leigh,* 487 F. 2d 206 (CA5 1973); *United States* v. *Bartee,* 479 F. 2d 484 (CA10 1973); *United States* v. *Jobe,* 487 F. 2d 268 (CA10 1973). The Ninth Circuit also had affirmed the conviction of a physician under § 841 (a) (1). *United States* v. *Larson,* 507 F. 2d 385 (1974). Since the ruling in this case, two other decisions have considered the issue and expressly rejected the analysis of the Court of Appeals for the District of Columbia Circuit. See *United States* v. *Rosenberg,* 515 F. 2d 190 (CA9 1975); *United States* v. *Green,* 511 F. 2d 1062 (CA7 1975). The Sixth Circuit has implicitly agreed. It reversed the conviction of a physician and remanded the case for a new trial because the trial court had failed to instruct the jury that physicians are exempt from prosecution under § 841 (a) (1) when they dispense or prescribe controlled substances in good faith to patients in the regular course of

Respondent advances two basic arguments, contending that each requires affirmance of the Court of Appeals: (i) as that court held, registered physicians may be prosecuted only under §§ 842 and 843; and (ii) in any event, respondent cannot be prosecuted under § 841 because his conduct was "authorized by [the] subchapter" in question. We now consider each of these arguments.

## II

### A

Section 841 (a)(1) makes distribution and dispensing of drugs unlawful "[e]xcept as authorized by this subchapter . . . ." Relying on this language, the Court of Appeals held that a physician registered under the Act is *per se* exempted from prosecution under § 841 because of his status as a registrant. We take a different view and hold that only the lawful acts of registrants are exempted. By its terms § 841 reaches "any person." It does not exempt (as it could have) "all registrants" or "all persons registered under this Act."

The Court of Appeals relied also on § 822 (b), which provides: "Persons registered . . . under this subchapter to . . . distribute, or dispense controlled substances are authorized to possess, . . . distribute, or dispense such substances . . . to the extent authorized by their registration and in conformity with the other provisions of this subchapter." This is a qualified authorization of certain activities, not a blanket authorization of all acts by certain persons. This limitation is emphasized by the subsection's heading "Authorized activities," which parallels the headings of §§ 841–843 "Unlawful acts." We think the statutory language cannot fairly be read to support the view that all activities of registered physi-

professional practice. *United States* v. *Carroll,* 518 F. 2d 187 (1975).

cians are exempted from the reach of § 841 simply because of their status.

If § 822 (b) were construed to authorize all such activities, thereby exempting them from other constraints, it would constitute a sharp departure from prior laws. . But there is no indication that Congress had any such intent. Physicians who stepped outside the bounds of professional practice could be prosecuted under the Harrison Act (Narcotics) of 1914, 38 Stat. 785, the predecessor of the CSA. In *Jin Fuey Moy* v. *United States,* 254 U. S. 189 (1920), the Court affirmed the conviction of a physician on facts remarkably similar to those before us (*e. g.,* no adequate physical examination, the dispensing of large quantities of drugs without specific directions for use, and fees graduated according to the amount of drugs prescribed). A similar conviction was upheld in *United States* v. *Behrman,* 258 U. S. 280 (1922), where the defendant-doctor had prescribed heroin, morphine, and cocaine to a person whom he knew to be an addict.

In enacting the CSA Congress attempted to devise a more flexible penalty structure than that used in the Harrison Act. H. R. Rep. No. 91–1444, Pt. 1, pp. 1, 4 (1970).[8] Penalties were geared to the nature of the violation, including the character of the drug involved. But the Act was intended to "strengthen," rather than to weaken, "existing law enforcement authority in the field of drug abuse." 84 Stat. 1236 (1970) (preamble). See also H. R. Rep. No. 91–1444, p. 1.

Section 822 (b) was added to the original bill at a late date[9] to "make it clear that persons registered under

---

[8] To this end controlled substances were classified in five categories according to their potential for abuse, their promise for treatment, and their psychological and physical effects. § 812.

[9] Section 822 (b) was added by the House Committee on Interstate and Foreign Commerce. No comparable section was in the Act when it passed the Senate on January 28, 1970.

this title are authorized to deal in or handle controlled substances." H. R. Rep. No. 91–1444, p. 38. It is unlikely that Congress would seek, in this oblique way, to carve out a major new exemption, not found in the Harrison Act, for physicians and other registrants. Rather, § 822 (b) was added merely to ensure that persons engaged in lawful activities could not be prosecuted.

## B

Respondent nonetheless contends that §§ 841 and 822 (b) must be interpreted in light of a congressional intent to set up two separate and distinct penalty systems: Persons not registered under the Act are to be punished under § 841, while those who are registered are to be subject only to the sanctions of §§ 842 and 843. The latter two sections, the argument goes, establish modest penalties which are the sole sanctions in a system of strict administrative regulation of registrants.

The operative language of those sections provides no real support for the proposition that Congress intended to establish two mutually exclusive systems. It is true that the term "registrants" is used in §§ 842 and 843, and not in § 841. But this is of limited significance. All three sections provide that "[i]t shall be unlawful for any person . . . [to commit the proscribed acts]." Two of the eight subsections of § 842 (a), one of the five subsections of § 843 (a), and § 842 (b) further qualify "any person" with "who is a registrant." The other subsections of §§ 842 and 843 are not so limited. In context, "registrant" is merely a limiting term, indicating that the only "persons" who are subject to these subsections are "registrants." [10] There is no indication that "persons"

---

[10] This represents a commonsense recognition by Congress that only a registrant could, for example, distribute drugs "not authorized by his registration," § 842 (a) (2), or manufacture substances "not expressly authorized by his registration" or "in excess of [his]

means "nonregistrants" when introducing the other subsections.

There are other indications that § 841, and §§ 842 and 843, do not constitute two discrete systems. Section 843 (b), for example, makes it unlawful for any person to use a communication facility in committing a felony under any provision of the subchapter. But violations of both § 841 and § 843 lead to felony convictions; criminal violations of § 842 are misdemeanors.[11] §§ 842 (c)(2)(A), 802 (13); 18 U. S. C. § 1. And counsel for respondent agreed at oral argument that registrants can be prosecuted under § 841 (a)(2), which prohibits the creation, distribution, dispensing, or possession with intent to distribute or dispense of a "counterfeit substance."

The legislative history indicates that Congress was concerned with the nature of the drug transaction, rather than with the status of the defendant. The penalties now embodied in §§ 841–843 originated in §§ 501–503 of the Controlled Dangerous Substances Act of 1969. The Report of the Senate Judiciary Committee on that bill described § 501 (the counterpart of § 841) as applying to "traffickers." S. Rep. No. 91–613, p. 8

---

quota." §§ 842 (b)(1), (2). Nor would there be any reason to apply to nonregistrants the penalties for distributing drugs without complying with the labeling and order-form requirements of the Act, §§ 842 (a)(3), 843 (a)(1), for nonregistrants are barred from making any distributions whatsoever.

[11] Another subsection which can be sensibly interpreted only if it reaches nonregistrants is § 842 (a)(1), which is limited to "any person—who is subject to the requirements of part C." Part C of the Act, §§ 821–829, covers the provisions for registration and applies to "[e]very person who manufactures, distributes, or dispenses any controlled substance or who proposes" to do so. § 822 (a). Presumably, § 842 (a)(1) is so phrased in order to reach those who should have registered but failed to do so.

(1969). Section 502 provided "[a]dditional penalties ... for those involved in the legitimate drug trade," and "[f]urther penalties . . . for registrants" were specified in § 503. S. Rep. No. 91–613, p. 9. The House Committee Report on the bill that was to become the CSA explains: "The bill provides for control ... of problems related to drug abuse through registration of manufacturers, wholesalers, retailers, and all others in the legitimate distribution chain, and makes transactions outside the legitimate distribution chain illegal." H. R. Rep. No. 91–1444, p. 3. Although this language is ambiguous, the most sensible interpretation is that the penalty to be imposed for a violation was intended to turn on whether the "transaction" falls within or without legitimate channels. All persons who engage in legitimate transactions must be registered and are subject to penalties under §§ 842 and 843 for "[m]ore or less technical violations." H. R. Rep. No. 91–1444, p. 10. But "severe criminal penalties" were imposed on those, like respondent, who sold drugs, not for legitimate purposes, but "primarily for the profits to be derived therefrom." *Ibid.*

## C

Congress was particularly concerned with the diversion of drugs from legitimate channels to illegitimate channels. *Id.,* at 6; S. Rep. No. 91–613, p. 4; 116 Cong. Rec. 996 (1970) (remarks of Sen. Dodd). It was aware that registrants, who have the greatest access to controlled substances and therefore the greatest opportunity for diversion, were responsible for a large part of the illegal drug traffic. See *id.,* at 1663 (remarks of Sen. Hruska); *id.,* at 998 (remarks of Sen. Griffin).

Recognizing this concern the Court of Appeals suggested that Dr. Moore could be prosecuted under § 842

136

(a)(1) for having violated the provisions of § 829 with respect to the issuing of prescriptions.[12]   Whether Dr. Moore could have been so prosecuted is not before the

[12] Section 829 provides, in part:

"(a) Schedule II substances.

"Except when dispensed directly by a practitioner, other than a pharmacist, to an ultimate user, no controlled substance in schedule II, which is a prescription drug as determined under the Federal Food, Drug, and Cosmetic Act, may be dispensed without the written prescription of a practitioner, except that in emergency situations, as prescribed by the Secretary by regulation after consultation with the Attorney General, such drug may be dispensed upon oral prescription in accordance with section 353 (b) of this title.   Prescriptions shall be retained in conformity with the requirements of section 827 of this title.   No prescription for a controlled substance in schedule II may be refilled.

"(b) Schedule III and IV substances.

"Except when dispensed directly by a practitioner, other than a pharmacist, to an ultimate user, no controlled substance in schedule III or IV, which is a prescription drug as determined under the Federal Food, Drug, and Cosmetic Act, may be dispensed without a written or oral prescription in conformity with section 353 (b) of this title.   Such prescriptions may not be filled or refilled more than six months after the date thereof or be refilled more than five times after the date of the prescription unless renewed by the practitioner.

"(c) Schedule V substances.

"No controlled substance in schedule V which is a drug may be distributed or dispensed other than for a medical purpose."

The Attorney General's regulations enacted pursuant to § 829 required:

"A prescription for a controlled substance to be effective must be issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice.   The responsibility for the proper prescribing and dispensing of controlled substances is upon the prescribing practitioner, but a corresponding responsibility rests with the pharmacist who fills the prescription. An order purporting to be a prescription issued not in the usual course of professional treatment or in legitimate and authorized research is not a prescription within the meaning and intent of

Court.[13]  We note, however, that the penalties for such
a violation could hardly have been deemed by Congress
to be an appropriate sanction for drug trafficking by a
registered physician.  Indeed, the penalty for convic-
tion under § 842 would be significantly lighter than, for
example, that applicable to a registrant convicted under
§ 843 for using a suspended registration number.[14]
Moreover, a physician who wished to traffic in drugs
without threat of criminal prosecution could, if violation
of § 829 were the sole basis for prosecution, simply dis-
pense drugs directly without the formality of issuing a
prescription.  Direct dispensing is exempt from § 829
and thus is not reached by any subsection of § 842 or

section 309 of the Act (21 U. S. C. 829) and the person knowingly
filling such a purported prescription, as well as the person issuing it,
shall be subject to the penalties provided for violations of the pro-
visions of law relating to controlled substances." 21 CFR § 306.04
(a) (1973) (redesignated as 21 CFR § 1306.04 (a) (1975)).

The court below suggested that a violation of the "medical
purpose" requirement of § 306.04 (a) makes a prescription some-
thing other than the "written prescription" required by § 829.
The dissent, which agreed that Dr. Moore could be prosecuted under
§ 842 (a)(1), did not rely on the regulations.  It found inherent in
the statutory term "prescription" a requirement that the order be is-
sued for a valid medical purpose.

[13] On its face § 829 addresses only the form that a prescription
must take.  A written prescription is required for Schedule II sub-
stances.  § 829 (a).  Either a written or an oral prescription is ade-
quate for drugs in Schedules III and IV.  § 829 (b).  The only
limitation on the distribution or dispensing of Schedule V drugs is
that it be "for a medical purpose."  § 829 (c).  The medical purpose
requirement explicit in subsection (c) could be implicit in subsec-
tions (a) and (b).  Regulation § 306.04 makes it explicit.  But
§ 829 by its terms does not limit the authority of a practitioner.

[14] In addition, a doctor who dispenses a controlled substance not
authorized by his registration to another registrant is also covered
by § 842 and would thus be punished as severely as a doctor who
sold drugs solely for financial profit to nonregistrants.  § 842 (a)(2).

§ 843 so long as the technical requirements are complied with.

But we think it immaterial whether Dr. Moore also could have been prosecuted for his violation of statutory provisions relating to dispensing procedures. There is nothing in the statutory scheme or the legislative history that justifies a conclusion that a registrant who may be prosecuted for the relatively minor offense of violating § 829 is thereby exempted from prosecution under § 841 for the significantly greater offense of acting as a drug "pusher." [15]

### III

Respondent argues that even if Congress did not intend to exempt registrants from all prosecutions under § 841, he cannot be prosecuted under that section because the specific conduct for which he was prosecuted was "authorized by [the] subchapter" and thus falls within the express exemption of the section.

The trial judge assumed that a physician's activities are authorized only if they are within the usual course of professional practice. He instructed the jury that it had to find

"beyond a reasonable doubt that a physician, who knowingly or intentionally, did dispense or distribute

[15] Respondent argues that the proper sanction for trafficking physicians is not criminal prosecution, but deregistration or refusal to reregister. But, under respondent's analysis, at the time he was convicted neither penalty could be imposed as a sanction for the conduct in which he engaged. Registration was mandatory for practitioners with state licenses, § 823 (f), and could only be suspended or revoked if the state license was revoked or suspended, if the practitioner had "materially falsified" an application under the Act, or if he had been convicted of a drug-related felony. § 824 (a). Conviction for a misdemeanor under § 842 would be insufficient to support revocation.

[methadone] by prescription, did so other than in good faith for detoxification in the usual course of a professional practice and in accordance with a standard of medical practice generally recognized and accepted in the United States." App. 123.

The Court of Appeals did not address this argument because it concluded that registrants could not be prosecuted under § 841 under any circumstances. But it suggested that if a registrant could be reached under § 841 he could not be prosecuted merely because his activities fall outside the "usual course of practice." 164 App. D. C., at 322 n. 11, 505 F. 2d, at 429 n. 11.

Under the Harrison Act physicians who departed from the usual course of medical practice were subject to the same penalties as street pushers with no claim to legitimacy. Section 2 of that Act required all persons who sold or prescribed certain drugs to register and to deliver drugs only to persons with federal order forms. The latter requirement did not apply to "the dispensing or distribution of any of the aforesaid drugs to a patient by a physician . . . registered under this Act in the course of his professional practice only." 38 Stat. 786. As noted above, Congress intended the CSA to strengthen rather than to weaken the prior drug laws. There is no indication that Congress intended to eliminate the existing limitation on the exemption given to doctors.[16] The difficulty

---

[16] The Narcotic Addict Treatment Act of 1974 (NATA), 88 Stat. 124, 21 U. S. C. §§ 802, 823, 824 (1970 ed., Supp. IV), modified the registration and revocation procedures provided in the CSA in order to facilitate "more expeditious" criminal prosecutions by making revocation easier.

There was no indication that Congress thought that trafficking doctors could escape felony prosecution altogether under pre-NATA law. Rather, it sought to "cure the present difficulty in such prosecutions because of the intricate and nearly impossible burden of establishing what is beyond 'the course of professional practice' for

arises because the CSA, unlike the Harrison Act, does not spell out this limitation in unambiguous terms.

Instead of expressly removing from the protection of the Act those physicians who operate beyond the bounds of professional practice, the CSA uses the concept of "registration." Section 822 (b) defines the scope of authorization under the Act in circular terms: "Persons registered ... under this subchapter ... are authorized [to dispense controlled substances] ... to the extent authorized by their registration and in conformity with the other provisions of this subchapter." But the scheme of the statute, viewed against the background of the legislative history, reveals an intent to limit a registered physician's dispensing authority to the course of his "professional practice."

Registration of physicians and other practitioners [17] is mandatory if the applicant is authorized to dispense drugs or conduct research under the law of the State in which he practices.[18] § 823 (f). In the case of a physi-

---

criminal law purposes when such a practitioner speciously claims that the practices in question were ethical and humanitarian in nature." S. Rep. No. 93-192, p. 14 (1973). Dr. Moore's conviction was cited to illustrate that successful criminal actions could be brought only "in the most aggravated of circumstances ... after prolonged effort to make undercover penetrations." *Id.*, at 13.

[17] "Practitioner" means "a physician, dentist, veterinarian, scientific investigator, pharmacy, hospital, or other person licensed, registered, or otherwise permitted, by the United States or the jurisdiction in which he practices or does research, to distribute, dispense, conduct research with respect to, administer, or use in teaching or chemical analysis, a controlled substance in the course of professional practice or research." § 802 (20).

[18] Under § 823, registration of manufacturers and nonpractitioner distributors (such as suppliers) is discretionary with the Attorney General. He first must make a finding that registration is consistent (in the case of manufacturers of Schedule I and II drugs) or not inconsistent (in the case of manufacturers of Schedule III–V

cian this scheme contemplates that he is authorized by the State to practice medicine and to dispense drugs in connection with his professional practice.[19] The federal registration, which follows automatically, extends no further. It authorizes transactions within "the legitimate distribution chain" and makes all others illegal. H. R. Rep. No. 91–1444, p. 3. Implicit in the registration of a physician is the understanding that he is authorized only to act "as a physician."

This is made explicit in § 802 (20), which provides that "practitioner" means one who is "registered . . . by the United States or the jurisdiction in which he practices or does research, to distribute, dispense, conduct research with respect to, administer, or use in teaching or chemical analysis, a controlled substance in the course of professional practice or research." This section defines the term "practitioner" for purposes of the Act. It also describes the type of registration contemplated by the Act. That registration is limited to the dispensing and use of drugs "in the course of professional practice or research."

Other provisions throughout the Act reflect the in-

---

drugs and all distributors) with the public interest. In evaluating the public interest the Attorney General is to consider, for example, "maintenance of effective controls against diversion," compliance with applicable state and local law, prior conviction record in drug-related charges, past experience, and (in the case of manufacturers) promotion of technical advances in manufacturing and the development of new substances. Practitioners and pharmacies are automatically entitled to registration to handle drugs in Schedules II–V "if they are authorized to dispense . . . under the law of the State in which they practice." § 823 (f).

[19] The House Report described the rationale behind § 823 (f) as follows: "Practitioners . . . engaged in the distribution chain would be required to be registered, but registration would be as a matter of right where the individual or firm is engaged in *activities* involving these drugs which are authorized or permitted under State law . . . ." H. R. Rep. No. 91–1444, p. 23 (1970) (emphasis added).

tent of Congress to confine authorized medical practice within accepted limits. Section 812 (b)(2) includes in its definition of Schedule II drugs a requirement that "[t]he drug [have] a currently accepted medical use with severe restrictions." Registration under the CSA to dispense or to conduct research with Schedule I drugs, which are defined as having "no currently accepted medical use in treatment in the United States," § 812 (b) (1)(B), does not follow automatically from state registration as it does with respect to drugs in Schedules II through V, all of which have some accepted medical use. § 823 (f). The record and reporting requirements of § 827 are made inapplicable with respect to narcotic drugs in Schedules II through V when they are prescribed or administered "by a practitioner in the lawful course of his professional practice." § 827 (c)(1)(A). Section 828 (a) prohibits the distribution of Schedule I and II drugs unless pursuant to specified order forms; § 828 (e) makes it unlawful for "any person" to obtain drugs with these order forms "for any purpose other than their use, distribution, dispensing, or administration in the conduct of a lawful business in such substances or in the course of his professional practice or research." Section 844 (a) prohibits possession of controlled substances unless the drug was obtained "from a practitioner, while acting in the course of his professional practice, or except as otherwise authorized . . . ." See also § 885 (a)(2).

The evidence presented at trial was sufficient for the jury to find that respondent's conduct exceeded the bounds of "professional practice." [20] As detailed above, he gave inadequate physical examinations or none at all.

---

[20] The jury was instructed that Dr. Moore could not be convicted if he merely made "an honest effort" to prescribe for detoxification in compliance with an accepted standard of medical practice. App. 124.

He ignored the results of the tests he did make. He did not give methadone at the clinic and took no precautions against its misuse and diversion. He did not regulate the dosage at all, prescribing as much and as frequently as the patient demanded. He did not charge for medical services rendered, but graduated his fee according to the number of tablets desired. In practical effect, he acted as a large-scale "pusher"—not as a physician.

## IV

Respondent further contended at trial that he was experimenting with a new "blockade" theory of detoxification. The jury did not believe him. Congress understandably was concerned that the drug laws not impede legitimate research and that physicians be allowed reasonable discretion in treating patients and testing new theories. But respondent's interpretation of the Act would go far beyond authorizing legitimate research and experimentation by physicians. It would even compel exemption from the provisions of § 841 of all "registrants," including manufacturers, wholesalers, and pharmacists—in addition to physicians.

In enacting the Comprehensive Drug Abuse Prevention and Control Act of 1970, 84 Stat. 1236, Title II of which is the CSA, Congress faced the problem directly. Because of the potential for abuse it decided that some limits on free experimentation with drugs were necessary. But it was also aware of the concern expressed by the Prettyman Commission:

> "[A] controversy has existed for fifty years over the extent to which narcotic drugs may be administered to an addict solely because he is an addict.

> .    .    .    .    .

> "The practicing physician has . . . been confused as to when he may prescribe narcotic drugs for an

addict. Out of a fear of prosecution many physicians refuse to use narcotics in the treatment of addicts except occasionally in a withdrawal regimen lasting no longer than a few weeks. In most instances they shun addicts as patients." [21]

Congress' solution to this problem is found in § 4 of Title I of the 1970 Act, 42 U. S. C. § 257a. That section requires the Secretary of Health, Education, and Welfare, after consultation with the Attorney General and national addict treatment organizations, to "determine the appropriate methods of professional practice in the medical treatment of ... narcotic addiction ...." It was designed "to clarify for the medical profession ... the extent to which they may safely go in treating narcotic addicts as patients." H. R. Rep. No. 91–1444, p. 14. Congress pointed out that "criminal prosecutions" in the past had turned on the opinions of federal prosecutors. Under the new Act, "[t]hose physicians who comply with the recommendations made by the Secretary will no longer jeopardize their professional careers . . . ." Id., at 15. The negative implication is that physicians who go beyond approved practice remain subject to serious criminal penalties.

In the case of methadone treatment the limits of approved practice are particularly clear. As Dr. Moore admitted at trial,[22] he was authorized only to dispense methadone for detoxification purposes. His authorization by the FDA to engage in a methadone maintenance program had been revoked. Nor was respondent unfamiliar with the procedures for conducting a legitimate detoxification program. Charges arising

---

[21] Report of the President's Advisory Commission on Narcotic and Drug Abuse 56–57 (1963), quoted in H. R. Rep. No. 91–1444, pp. 14–15.

[22] App. 101.

out of his 1969 treatment program, which involved a combination of "long term" and "short term" detoxification, were dropped after he testified before a grand jury and agreed to abide by certain medical procedures in future methadone programs. These included obtaining a medical history of each patient, conducting a reasonably thorough physical examination, abiding by the results of urine tests, recording times and amounts of dosages, and either administering the methadone in his office or prescribing no more than a daily dosage.[23] At trial respondent admitted that he had failed to follow these procedures.[24]

V

Respondent argues finally that the statute is sufficiently ambiguous that it must be construed in his favor despite the clear intent of the Congress. It is true that "when choice has to be made between two readings of what conduct Congress has made a crime, it is appropriate, before we choose the harsher alternative, to require that Congress should have spoken in language that is clear and definite." *United States* v. *Universal C. I. T. Credit Corp.,* 344 U. S. 218, 221–222 (1952). In this case, however, the principle set forth in *United States* v. *Brown,* 333 U. S. 18, 25–26 (1948), is appropriately followed:

> "The canon in favor of strict construction [of criminal statutes] is not an inexorable command to override common sense and evident statutory purpose. . . . Nor does it demand that a statute be given the 'narrowest meaning'; it is satisfied if the words are given their fair meaning in accord with the manifest intent of the lawmakers."

---

[23] *Id.,* at 97–100, 116, 136–138.
[24] *Id.,* at 97–100.

The judgment of the Court of Appeals is reversed. Because of its disposition of the case, that court did not reach the question whether respondent could be sentenced under 21 U. S. C. § 845, which provides a higher penalty for distribution of controlled substances to persons under 21 years of age. We remand for the sole purpose of considering respondent's claim that he was improperly sentenced under that section.

*So ordered.*