PEOPLE v ALFORD

1. DRUGS AND NARCOTICS—DELIVERY—TRANSFER—PRESCRIBING DRUGS
—LICENSED PRACTITIONERS—STATUTES.

Delivery under the Controlled Substances Act of 1971 is any transfer of a controlled substance from one person to another, whether that transfer is actual or constructive, and whether or not there is an agency relationship; delivery includes the prescribing of drugs by a licensed practitioner of medicine (MCLA 335.304[1], [2]; MSA 18.1070[4][1], [2]).

2. DRUGS AND NARCOTICS—STATUTES—DISTRIBUTION—LICENSED PRAC-
TITIONERS—DELIVERY.

Distribution under the Controlled Substances Act of 1971 is delivery of a controlled substance which is accomplished other than by administering or dispensing; a licensed practitioner of medicine who hands barbiturates to a patient is delivering a controlled substance under the act (MCLA 335.304[4]; MSA 18.1070[4][4]).

3. DRUGS AND NARCOTICS—LICENSED PRACTITIONERS—CRIMINAL LAW
—IMMUNITY—PROFESSIONAL PRACTICE.

A licensed practitioner of medicine is not exempt from prosecution under the Controlled Substances Act of 1971 merely because of his registered status; his activities are only protected to the extent they are performed within the course of professional practice (MCLA 335.341[1]; MSA 18.1070[41][1]).

4. CRIMINAL LAW—ENTRAPMENT—GOVERNMENT CONDUCT—UNDER-
COVER AGENTS—CHARACTER OF ACCUSED.

An entrapment claim is tested in the courts without consideration of the character and propensities of the accused, with the focus being on whether governmental conduct induced or instigated the commission of the crime; the use of a governmental

---

REFERENCES FOR POINTS IN HEADNOTES

[1] 25 Am Jur 2d, Drugs, Narcotics, and Poisons §§ 16–23.
[2] 25 Am Jur 2d, Drugs, Narcotics, and Poisons §§ 3, 4, 7–9, 11.
[3] 25 Am Jur 2d, Drugs, Narcotics, and Poisons § 63.
[4] 25 Am Jur 2d, Drugs, Narcotics, and Poisons §§ 43, 46, 47.
  29 Am Jur 2d, Evidence § 409.

undercover agent posing as a patient is insufficient, in itself, to support a finding of entrapment in a criminal action against a doctor for unlawful delivery of a controlled substance to the agent.

Appeal from Wayne, Victor J. Baum, J. Submitted February 4, 1976, at Detroit. (Docket No. 20741.) Decided February 8, 1977.

Elvis S. Alford was charged by information with two counts of unlawful delivery of a controlled substance. Defendant moved to quash the information. Motion granted. The people appeal by leave granted. Reversed.

*Frank J. Kelley,* Attorney General, *Robert A. Derengoski,* Solicitor General, *William L. Cahalan,* Prosecuting Attorney, *Patricia J. Boyle,* Principal Attorney, Research, Training and Appeals, and *Larry L. Roberts,* Assistant Prosecuting Attorney, for the people.

*Cyril Abramson,* for defendant on appeal.

Before: BASHARA, P. J., and N. J. KAUFMAN and D. F. WALSH, JJ.

D. F. WALSH, J. The people of the State of Michigan appeal from an order of the Wayne County Circuit Court quashing an information filed against defendant Elvis S. Alford.

The information charges the defendant with violations of § 41(b) of the Controlled Substances Act of 1971. MCLA 335.341(1)(b); MSA 18.1070(41)(1)(b). The charge is contained in two counts. The first count alleges that Dr. Alford "did unlawfully deliver a controlled substance, to wit: 120 capsules containing amphetamine * * * ". The second count alleges that Dr. Alford "did

unlawfully deliver a controlled substance, to wit: 103 capsules containing barbituates *[sic]*".

The facts are not in dispute. On March 12, 1973, Justin Kukalis, a Michigan State Police officer working in the Diversion Investigation Unit, Intelligence Division, visited Dr. Alford's office in Belleville, Michigan, as a patient. He complained of being overweight. The doctor weighed the officer, took his blood pressure by placing the blood pressure cuff over the officer's jacket and then gave him some medication. The medication consisted of 92 small beige pills and 74 flat pink double-scored pills and a prescription for 30 amphetamine capsules. The doctor explained how to use the medication and told Kukalis to return in two weeks.

Thereafter, Kukalis made eight more visits to Dr. Alford's office and was given medication on each occasion and prescriptions for amphetamines on all but one occasion. The final visit took place on June 1, 1973. On this visit Dr. Alford gave Kukalis barbiturates in the form of red and blue pills and four prescriptions for amphetamines, one for himself, one for his wife, and one each for two other parties whose names Kukalis supplied to Dr. Alford. Neither Kukalis' wife nor either of the other two parties were ever in Dr. Alford's office. It was for the alleged deliveries made on this date that Dr. Alford is charged in this case.

The trial judge made an extensive analysis of the pertinent provisions of the statute. As to count 1, he concluded that "delivery", as that term is defined in the statute, does not include the prescribing of drugs by a practitioner. As to count 2, he concluded that the statute either "frees licensed physicians, without qualification, to hand out barbiturate drugs, or it permits them to hand out such drugs to people who come to their offices

for professional consultation regardless of whether the physician's conduct falls short of the standards of skill, care and ethics customarily employed by their co-professionals".

The trial judge further determined that Officer Kukalis' conduct constituted entrapment as a matter of law. For these reasons, the court quashed the information and dismissed Dr. Alford.

Prior to 1970 the narcotics laws at the Federal level were in an almost chaotic state. In response Congress enacted the Comprehensive Drug Abuse Prevention and Control Act of 1970. Title II of this act, 84 Stat 1242 *et seq.* (1970), 21 USC 801 *et seq.,* is significant, since it provided the model for the Uniform Controlled Substances Act passed in a number of states.[1] The uniform act was adopted in Michigan as the Controlled Substances Act of 1971, 1971 PA 196; MCLA 335.301 *et seq.;* MSA 18.1070(1) *et seq.,* 52 Mich S B J 617, 618.[2]

We initially consider whether "delivery" includes the prescribing of drugs by a practitioner. The concept of "delivery" as defined in the act is a very general one. "Delivery" is any transfer of a controlled substance from one person to another, whether that transfer is actual or constructive, and whether or not there is an agency relationship. It also includes an attempted transfer. MCLA 335.304(1); MSA 18.1070(4)(1). Dispensation and distribution are defined as specific types of delivery. "Dispensation" is a delivery of a controlled substance to an ultimate user pursuant to the lawful order of a practitioner. The statute explicitly provides that dispensation includes the "prescribing * * * necessary to prepare the substance

[1] *See* 16A MCLA (1976–1977 Supp) 31.

[2] Barton, *The Controlled Substances Act of 1971,* 52 Michigan State Bar Journal 617 (1973).

for that delivery". MCLA 335.304(2); MSA 18.1070(4)(2): Hence, if a doctor writes a prescription pursuant to which a controlled substance is delivered to another, the doctor is "dispensing" that substance. To say that the doctor who dispenses the controlled substance does not deliver it seems inconsistent with the basic definition of dispensation as a "delivery" to an ultimate user pursuant to lawful order. In our judgment, therefore, when Dr. Alford prescribed amphetamines for Officer Kukalis, he was delivering to him a controlled substance.

Similarly "distribution" is also a delivery. The statute defines "distribution" as a delivery of a controlled substance which is accomplished other than by administering[3] or dispensing. MCLA 335.304(4); MSA 18.1070(4)(4). Thus, when Dr. Alford handed barbiturates to Officer Kukalis, he was delivering a controlled substance.

Our next determination is directed to whether MCLA 335.341(1); MSA 18.1070(41)(1) exempts a registered physician from prosecution for delivery of controlled substances without qualification. In considering this issue it is appropriate for us to look to Federal precedent for guidance, since the Controlled Substances Act of 1971 was modeled after the Federal act. *Michigan Employment Relations Commission v Reeths-Puffer School District,* 391 Mich 253, 260; 215 NW2d 672 (1974), *Citizens for Better Care v Department of Public Health,* 51 Mich App 454, 463; 215 NW2d 576 (1974), *lv den,* 392 Mich 758 (1974).

---

[3] MCLA 335.303; MSA 18.1070(3).

"Sec. 3(1) 'Administer' means the direct application of a controlled substance, whether by injection, inhalation, ingestion or any other means, to the body of a patient or research subject by a practitioner, or in his presence by his authorized agent, or the patient or research subject at the direction and in the presence of the practitioner."

In Michigan delivery of a controlled substance is unlawful except as authorized under the act. MCLA 335.341(1); MSA 18.1070(41)(1).[4] Likewise, the Federal counterpart makes it unlawful to distribute or dispense a controlled substance except as specifically authorized. 84 Stat 1260 (1970), 21 USC 841(a)(1).[5]

Authorization is granted in this state pursuant to MCLA 335.332(2); MSA 18.1070(32)(2), which provides:

"(2) Persons registered by the administrator under this act to manufacture, distribute, prescribe, dispense or conduct research with controlled substances may possess, manufacture, distribute, prescribe, dispense or conduct research with those substances to the extent authorized by their registration and in conformity with the other provisions of this chapter."

Dr. Alford was registered by the administrator and was therefore authorized to distribute, prescribe or dispense controlled substances to the extent authorized by his registration and in conformity with chapter three of the act. MCLA 335.331–335.338; MSA 18.1070(31)–18.1070(38).

In very similar language, authorization is granted under the Federal scheme pursuant to 84 Stat 1253 (1970), 21 USC 822(b). It provides:

"(b) Persons registered by the Attorney General under this subchapter to manufacture, distribute, or dis-

---

[4] MCLA 335.341(1); MSA 18.1070(41)(1).

"Sec. 41. (1) Penalties. Except as authorized by this act, it is unlawful for any person to manufacture, deliver or possess with intent to manufacture or deliver, a controlled substance."

[5] 84 Stat 1260 (1970), 21 USC 841(a)(1).

"(a) Except as authorized by this subchapter, it shall be unlawful for any person, knowingly or intentionally—

"(1) to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance;"

pense controlled substances are authorized to possess, manufacture, distribute, or dispense such substances (including any such activity in the conduct of research) to the extent authorized by their registration and in conformity with the other provisions of this subchapter."

In *United States v Moore,* 423 US 122, 132–133; 96 S Ct 335; 46 L Ed 2d 333 (1975), Justice Powell, writing for a unanimous Supreme Court, construed this provision as granting a qualified authorization, not a general authorization intended to legitimize all activities of registered physicians simply because of their registration. He concluded that the "scheme of the statute, viewed against the background of the legislative history, reveals an intent to limit a registered physician's dispensing authority to the course of his 'professional practice' ". *United States v Moore, supra,* 140.

In *Moore* the court investigated the legislative history of the act and determined that it was intended "to 'strengthen', rather than to weaken, existing law enforcement authority in the field of drug abuse", *United States v Moore, supra,* 132. A blanket exemption for physicians would constitute a sharp departure from prior law. The legislative history revealed no congressional intent to create such an exemption. *United States v Moore, supra.*

The legislative history of the Controlled Substances Act of 1971[6] gives no indication that the Michigan Legislature intended to grant such an exemption to physicians. Nor will we lightly infer such an intent existed, where it is in direct conflict with prior law. See 1937 PA 343, § 7, as amended, *People v Downes,* 394 Mich 17; 228 NW2d 212 (1975).

The *Moore* court then proceeded to examine the

[6] House Bill 4882 (1971).

scheme of the Federal act. For example it pointed to 84 Stat 1242 (1970), 21 USC 802 (20), which provides:

"(20) The term 'practitioner' means a physician, dentist, veterinarian, scientific investigator, pharmacy, hospital, or other person licensed, registered, or otherwise permitted, by the United States or the jurisdiction in which he practices or does research, to distribute, dispense, conduct research with respect to, administer, or use in teaching or chemical analysis, a controlled substance in the course of professional practice or research."

Justice Powell concluded that this provision defined practitioner and described the type of registration contemplated by the act. By registration a practitioner is limited "to the dispensing and use of drugs 'in the course of professional practice and research' ". *United States v Moore, supra,* 141.

The counterpart to 21 USC 802(20) is MCLA 335.307(3)(a); MSA 18.1070(7)(3)(a). It provides:

"(3) 'Practitioner' means:
"(a) A *physician, dentist, veterinarian or pharmacist* as defined in subdivisions (o), (p), (q) and (w) of section 1 of Act No. 151 of the Public Acts of 1962, as amended, being section 338.1101 of the Compiled Laws of 1948, *scientific investigator* as defined by rule of the administrator, or *other person* licensed, registered or otherwise permitted to distribute, dispense, conduct research with respect to or to administer a controlled substance in *the course of professional practice or research in this state."* (Emphasis supplied.)

There is some doubt as to whether "in the course of professional practice or research" modifies only "other person" or modifies all the classes enumerated. Although this provision is inartfully drafted, we believe that the United States Su-

preme Court's construction is most acceptable in view of the legislative intent.

Moreover, like the Federal act, the overall scheme of the Controlled Substances Act of 1971 reveals a legislative intent to place limitations on practitioners. For instance, MCLA 335.305(2); MSA 18.1070(5)(2) defines "manufacture", but provides an exception for the "preparation, compounding, packaging or labeling of a controlled substance (a) by a practitioner as an incident to his administering or dispensing of a controlled substance *in the course of his professional practice".* (Emphasis supplied.) It is also unlawful for a person "knowingly or intentionally to possess a controlled substance unless * * * obtained directly from, or pursuant to, a valid prescription or order of a practitioner *while acting in the course of his professional practice * * * "* (Emphasis supplied.) MCLA 335.341(4), (5); MSA 18.1070(41)(4), (5). Furthermore, a "practitioner *engaged in professional practice"* (emphasis supplied) is granted a privilege from being compelled to furnish the name or identity of a patient. MCLA 335.354(3); MSA 18.1070(54)(3).

Section 63 of the act provides that "[t]his act shall be so applied and construed as to effectuate its general purpose to make uniform the law with respect to the subject of this act among those states which enact laws similar to it". MCLA 335.363; MSA 18.1070(63). Both Maryland and New Jersey have adopted acts patterned after the Uniform Controlled Substances Act. Both states have followed *United States v Moore, supra,* and concluded that physicians were not exempt from prosecution under provisions similar to MCLA 335.341(1); MSA 18.1070(41)(1), merely because of their status. *State v Fearing,* 30 Md App 134; 351

A2d 896 (1976),[7] and *State v Vaccaro,* 142 NJ Super 167; 361 A2d 47 (1976).[8]

[7] Md Code 1957, art 27, § 286(a)(1) prohibits the following conduct:

"(a) Except as authorized by this subheading, it shall be unlawful for any person:

"(1) To manufacture, distribute, or dispense, or to possess a controlled dangerous substance in sufficient quantity to reasonably indicate under all circumstances an intent to manufacture, distribute, or dispense, a controlled dangerous substance;"

Authorization is provided for as follows:

"(a) *Persons required to register annually.*—Every person who manufactures, distributes, or dispenses any controlled dangerous substance within the State or who proposes to engage in the manufacture, distribution, or dispensing of any controlled dangerous substance within the State, shall obtain annually a registration issued by the Department in accordance with the rules and regulations promulgated by the Department. Persons registered by the Department under this subheading to manufacture, distribute or dispense controlled dangerous substances are authorized to possess, manufacture, distribute, or dispense such substances (including any such activity in the conduct of research) to the extent authorized by their registration and in conformity with the other provisions of this subheading." Md Code 1957, art 27, § 281(a).

A practitioner is defined as follows:

"(t) *'Practitioner'* shall mean one of the following:

"(1) A physician, dentist, veterinarian, scientific investigator, or other person licensed, registered or otherwise permitted to distribute, dispense, conduct research with respect to or administer a controlled dangerous substance in the course of professional practice or research in this State." Md Code 1957, art 27, § 277(t).

By rejecting the status argument and following *United States v Moore,* 423 US 122; 96 S Ct 335; 46 L Ed 2d 333 (1975), the court in *State v Fearing,* 30 Md App 134; 351 A2d 896 (1976), was holding that a physician's activities were subject to prosecution under Md Code 1957, art 27, § 286(a)(1) if they fell outside the usual course of professional practice.

[8] At the time of *State v Vaccaro,* 142 NJ Super 167; 361 A2d 47 (1976), NJ Stat Ann 24:21–19a prohibited the following conduct:

"a. Except as authorized by this act, it shall be unlawful for any person * * * :

"(1) To manufacture, distribute, or dispense, or to possess or have under his control with intent to manufacture, distribute, or dispense, a controlled dangerous substance;"

Authorization was provided for as follows:

"b. Persons registered by the commissioner under this act to manufacture, distribute, dispense, or conduct research with controlled dangerous substances are authorized to possess, manufacture, distribute, dispense, or conduct research with those substances to the extent authorized by their registration and in conformity with the other provisions of this article." NJ Stat Ann 24:21–10b.

Practitioner was and is presently defined as follows:

We hold, therefore, that a practitioner is not exempt from prosecution under MCLA 335.341(1); MSA 18.1070(41)(1), merely because of his registered status. The practitioner's activities are only protected to the extent they are performed within the course of professional practice. We are aware of the decision of another panel of this court in *People v Kerwin,* 56 Mich App 483; 224 NW2d 113 (1974), *lv den* 393 Mich 807 (1975). To the extent that decision is inconsistent with our holding here we decline to follow it.

The final issue for our consideration is whether Dr. Alford was entrapped as a matter of law. In *People v Turner,* 390 Mich 7, 19–21; 210 NW2d 336 (1973), the Michigan Supreme Court relied upon the dissenting opinion of Justice Stewart in *United States v Russell,* 411 US 423, 439–450; 93 S Ct 1637; 36 L Ed 2d 366 (1973), and adopted the objective standard of entrapment. The focus of the

---

" 'Practitioner' means a physician, dentist, veterinarian, scientific investigator, laboratory, pharmacy, hospital or other person licensed, registered, or otherwise permitted to distribute, dispense, conduct research with respect to, or administer a controlled dangerous substance in the course of professional practice or research in this State." NJ Stat Ann 24:21–2.

As we have done here, the court in *State v Vacarro, supra,* looked to the overall statutory scheme. It pointed to NJ Stat Ann 24:21–15a which states:

"a. Except when dispensed directly in good faith by a practitioner, other than a pharmacist, in the course of his professional practice only, to an ultimate user, no controlled dangerous substance included in Schedule II, which is a prescription drug as defined in R.S. 45:14–14 may be dispensed without the written prescription of a practitioner; provided that in emergency situations, as prescribed by the State Department of Health by regulation, such drug may be dispensed upon oral prescription reduced promptly to writing and filed by the pharmacist, if such oral prescription is authorized by Federal law."

The court concluded that physicians were exempt under NJ Stat Ann 24:21–19a, only to the extent they acted in good faith and in the course of professional practice. Although Michigan's Controlled Substances Act of 1971 does not contain a similar limiting provision, *see* MCLA 335.338(1); MSA 18.1070(38)(1), other provisions within our act lead us to the same conclusion.

objective test is on reprehensible government conduct and not on the character and propensities of the defendant. The issue is whether the government conduct induced or instigated the commission of a crime. *United States v Russell, supra, People v Turner, supra,* 21. The objective standard applies prospectively to proceedings, such as here, arising after the decisional date in *People v Turner, supra. People v Auer,* 393 Mich 667, 672, 676–677; 227 NW2d 528 (1975), *reh den,* 394 Mich 944 (1975), *People v Zeegers,* 61 Mich App 546, 549; 233 NW2d 76 (1975), *lv den,* 395 Mich 807 (1975).

The facts in the case at bar do not indicate the government conduct was of such a nature as to give rise to a finding of entrapment. For example, there was no false story to play on the defendant's sympathies, *People v Turner, supra,* or improper inducements upon known weaknesses of the defendant. *People v Asher,* 67 Mich App 174; 240 NW2d 749 (1976).

The government's use of an undercover agent posing as a patient, upon the facts before us, is insufficient to support a finding of entrapment. Justice Stewart makes this point in *Russell* where he states:

"This does not mean, of course, that the Government's use of undercover activity, strategy, or deception is necessarily unlawful. *Lewis v United States,* 385 US 206, 208–209 [87 S Ct 424, 425–427; 17 L Ed 2d 312] (1966). Indeed, many crimes, especially so-called victimless crimes, could not otherwise be detected. Thus, government agents may engage in conduct that is likely, when objectively considered, to afford a person ready and willing to commit the crime an opportunity to do so. *Osborn v United States,* 385 US 323, 331–332 [87 S Ct 429, 433–434; 17 L Ed 2d 394] (1966). See also

*Sherman v United States, supra,* at 383–384; (Frank-furter, J., concurring)." *United States v Russell, supra,* 445.

Reversed.