State v. Best

STATE OF NORTH CAROLINA v. ANDREW ARTHUR BEST

No. 763SC338

(Filed 3 November 1976)

1. **Physicians, Surgeons and Allied Professions § 1; Narcotics § 1— Controlled Substances Act — regulation of drug prescriptions — consistency of provisions**

    The N. C. Controlled Substances Act, G.S. 90-86 *et seq.*, is not unconstitutional by virtue of its being inconsistent within itself in delineating when a physician's actions in the prescribing of drugs are lawful or unlawful, since sections of the Act defining "practitioner" as one licensed to dispense a controlled substance so long as such activity is "within the normal course of professional practice or research in this State" and "prescription" as an order for a controlled substance issued by a practitioner licensed to prescribe drugs "in the course of *his* professional practice" mean that a lawful prescription must be one that is issued by a practitioner, who is licensed to prescribe drugs in the course of his practice, within the normal course of professional practice in this State. G.S. 90-87(22)a and G.S. 90-87(23)a.

2. **Narcotics § 1— regulation of drug prescriptions — no vagueness — constitutionality of Controlled Substances Act**

    Provisions of the N. C. Controlled Substances Act prohibiting a practitioner from distributing drugs other than for a legitimate

medical purpose "within the normal course of professional practice" are not unconstitutionally vague because they forbid conduct in such terms that men of common intelligence must necessarily guess at their meaning and application.

3. **Criminal Law § 124; Narcotics § 5— sale of controlled substance — prescription of drug by doctor — refills — conviction for refills but not original prescription — inconsistency not prejudicial**

In a prosecution of defendant doctor for felonious sale and delivery of controlled substances based upon defendant's prescription of a drug for an SBI agent, two refills of the prescription, and prescription of another drug, the trial court did not err in denying defendant's motion for judgment n.o.v. or in allowing to stand the verdicts of guilty as to the refills of the prescription, though defendant was acquitted on the indictment relating to the initial prescription on which the subsequent refills were based, since there was evidence sufficient to support a conviction on each of the charges for which defendant was tried, but the jury was at liberty to accept or reject that evidence and was not required to be consistent.

Judge CLARK dissenting.

APPEAL by defendant from *Tillery, Judge.* Judgment entered 19 November 1975 in Superior Court, PITT County. Heard in the Court of Appeals 1 September 1976.

Defendant, Dr. Best, was charged in six bills of indictment with the felonious sale and delivery of controlled substances. He pleaded not guilty.

The State offered evidence tending to show the following:

M. T. Owens, an SBI agent, visited defendant's office on four occasions posing as a patient. On the first three visits she received prescriptions for the controlled substance, Methylphenidate, in the form of Ritalin, and on the final visit she received the controlled substance, Phenobarbital, in tablet form.

Agent Owens first visited defendant's office on 4 February 1975, using the alias of Martha Ann Taylor. She told defendant's receptionist that she was a waitress and waited approximately one hour to see defendant. Before seeing defendant she was weighed and her blood pressure and temperature were taken and recorded by a nurse. When defendant came into the examination room where she had been placed by the nurse, he asked her what he could do for her. She then told him that she was working as a waitress at the bus station and needed something to stay awake. She informed him that she had been taking Dexadrine and "other junk." Defendant then noted that the Dexa-

drine was probably causing her high blood pressure and said "let me see if I can get you something better." The defendant then left the room and returned in about two minutes saying that he had checked the bus schedule and found that there were no buses coming in late at night. She then explained that she worked at Hardee's from 9:00 to 5:00 and from 8:00 until 2:00 or 3:00 in the morning she was at the bus station "hustling." Defendant, after a slight pause, looked at her and said, "oh, you are doing that kind of work." Defendant told her that she should be careful with Dexadrine because the "heat" is on it. When she asked what he meant by that statement, he made no response. Defendant then requested that she return to the reception area.

Defendant then gave the receptionist a prescription, which read, "Martha Taylor, Apartment 22, Cherry Court, dated 2-4-75, Ritalin tablets, No. 36, one tablet b.i.d." Agent Owens received the prescription from the receptionist in return for the $5.00 fee, for which she was given a receipt. She left the office and, after meeting with other SBI officers, went to a drugstore and had the prescription filled.

Agent Owens visited defendant's office again on 27 February 1975, where she handed the bottle that she had received from the drugstore to the receptionist and requested a refill. The receptionist took the bottle, wrote something down on a piece of paper, moved to a filing cabinet, pulled out a yellow card and told her to have a seat. Later the receptionist returned and asked to see the bottle again. Owens testified that she watched the receptionist write out the prescription. Defendant signed the prescription and his only statement to the agent was, "here it is." Defendant made no inquiry or examination of the agent. The prescription was the same as the one set forth above and the charge was, again, $5.00. The same routine was followed when Owens next visited defendant's office on 19 March 1975 except (1) she asked to see defendant after she had been given the refill prescription and (2) the prescription was signed in blank form by the defendant before it was completed by the receptionist. She did not see the doctor on this visit, and once again she paid $5.00 for the prescription.

Owens' final visit to the defendant's office was on 25 March 1975, at which time she told the receptionist that she would like to see the doctor and signed the register. On this occasion her blood pressure and temperature were taken by the

nurse, though she was not weighed or questioned by the nurse. When Dr. Best came into the examination room he greeted the agent and asked what he might do for her. She told him that the pills that he had prescribed for her had been making her nervous. Defendant then told her that she should have been taking the pills every other day instead of every day and asked if she was still taking Ritalin. He then said that he could give her something to calm her down and left the examination room without asking her any more questions. Defendant placed a vial of 115 Phenobarbital tablets and handwritten instructions to take one tablet before supper and 2 at bedtime on the counter in the waiting room. Owens paid $8.00 for the pills and consultation.

Dr. Edward G. Bond was qualified as an expert witness and testified as follows: He is familiar with the controlled substance Ritalin. There are three legitimate uses of that drug, and they are (1) for the so-called hyperactive child, (2) in cases of narcolepsy (a sleep disorder), and (3) for people with a mild depression.

Dr. Bond was asked the following set of hypothetical questions:

" . . . If the jury should find as a fact from the evidence beyond a reasonable doubt that a young woman, aged twenty-nine, came to a doctor's office for the first time; that the woman signed a yellow pad and was asked by a receptionist for her name, address, date of birth, occupation and the names of her parents; that thereafter she was weighed by a nurse and her weight was recorded at a hundred forty-seven pounds; that the nurse took her blood pressure and temperature and recorded them at a hundred sixty over eighty and her temperature at 99.6; that she had a conversation in an examining room with the doctor in which she asked for something to stay awake because she was working late; that the doctor asked what she had been taking to stay awake and she answered, Dexadrine and some other junk; that the doctor said that the Dexadrine is probably the reason your blood pressure is up, let me see if I can give you something better, and left the room; that the doctor returned to ask her about her hours and she indicated that she worked at Hardee's from nine until five during the day and at night from eight until two or three in the morning she worked as a prostitute; that the

State v. Best

doctor said, That Dexadrine, be real careful with it, the heat's on that; that the doctor wrote a script without including the date or the name of the patient; that he took the script and the woman to the reception desk and gave the script to a receptionist and instructed her to write the woman's name on the prescription; that the receptionist wrote the woman's name on the script, and charged the woman five dollars; that the script called for thirty-six Ritalin, ten milligrams, with the signa, One tab twice daily, with no refills indicated; that Ritalin, ten milligrams, is a trade name for the Schedule II substance Methylphenidate; that during the time the woman was in the doctor's office, no medical history was obtained by the doctor; that the doctor asked the woman no questions concerning her health; that the doctor never examined or touched the woman in any way. Based upon these facts, Doctor, and your experience as a medical practitioner and medical expert, do you have an opinion satisfactory to yourself as to whether such a prescription was outside the usual course of a doctor's professional practice in this State?

\*    \*    \*

A. Yes, sir.

Q. What is that opinion, Doctor?

\*    \*    \*

A. I feel that this is outside the usual customary practice.

Q. Based on those same facts, Doctor, and your experience as a medical expert and as a medical practitioner, do you have an opinion satisfactory to yourself as to whether such a prescription was written for a legitimate medical purpose?

\*    \*    \*

A. Yes, sir.

Q. What is that opinion, Doctor?

A. I would say it was not written for a legitimate medical purpose.

\*    \*    \*

Q. Based upon those same facts, Doctor in your experience as a medical expert and medical practitioner, do you have

State v. Best

an opinion satisfactory to yourself as to whether the doctor in writing such a prescription was acting outside the normal course of a doctor's professional practice of medicine in this State?

\*   \*   \*

A. Yes, sir.

Q. What is that opinion, Doctor?

\*   \*   \*

A. I would say that he was acting outside of the normal course, in my opinion, of practice in the State.

\*   \*   \*

Q. Upon what do you base your opinions, Doctor?

\*   \*   \*

A. I think the problem here the drug used was not a legitimate use of this drug. Like I've stated before, even if the drug was to be used legitimately, apparently, from what you cited, there wasn't any examination of the patient to find out, even if the drug was to be used, might be used properly without any harm to the patient.

\*   \*   \*

Q. Doctor, I ask you to assume the same facts in the immediately preceding question about the lady, and if the jury should find as a fact from the evidence beyond a reasonable doubt those facts and further that the same woman returned to the doctor's office twenty-three days later; that the woman showed the receptionist the prescription bottle she had obtained previously and stated that she wanted to get it refilled; that the receptionist took the script bottle, wrote something, left the room and returned, at which time she took a script pad and wrote out a prescription; that the receptionist left the room and went into the examining area with the script; that shortly thereafter, the doctor came out to the counter, put the script on the counter and stated, Here it is; that the script was for thirty-six Ritalin, ten milligrams; that Ritalin is the Schedule II Substance, Methylphenidate; that the woman paid the receptionist five dollars for the prescription; that on this visit no medical history was taken by the doctor or by anyone else; that the woman's blood pressure was not

State v. Best

checked; that her weight was not checked; that her temperature was not taken; that the doctor asked the woman no questions; that the doctor never examined or touched the woman in any way on this visit. Now, Doctor, based on these facts and your experience as a medical practitioner and as a medical expert, do you have an opinion satisfactory to yourself as to whether such a prescription was outside the usual course of a doctor's professional practice in this State?

\*   \*   \*

A. Yes, sir.

Q. And what is that opinion?

\*   \*   \*

A. My opinion would be that it is outside the usual customary practice in this State.

\*   \*   \*

Q. Based on the facts I have mentioned in the two factual situations I have asked you to consider and on your experience as a medical expert, do you now have an opinion satisfactory to yourself as to whether such a prescription was written for a legitimate medical purpose?

\*   \*   \*

A. Yes, sir.

Q. What is that opinion?

\*   \*   \*

A. My opinion would be that it was not written for a legitimate medical purpose.

\*   \*   \*

Q. Based on these facts I just recited, Doctor, and your experience as a medical expert and medical practitioner, do you have an opinion satisfactory to yourself as to whether the doctor in writing such a prescription was acting outside the normal course of a doctor's professional practice of medicine in this State?

\*   \*   \*

A. Yes, sir.

Q. What is that opinion?

*   *   *

A. That he was acting outside of the usual customary practice in this State.

*   *   *

Q. Doctor, I ask you to assume the facts as I have recited in the two preceding circumstances, and if the jury should find as a fact beyond a reasonable doubt from the evidence the facts that I recited there and further that twenty days after the second visit and forty-four days after the first visit, the woman visited the doctor's office a third time; that she entered the office and spoke with the receptionist identifying herself and asking to get her prescription refilled; that she showed the receptionist the prescription bottle; that the receptionist looked at the bottle, walked to a card file, pulled a card and left the desk and walked out of sight into the examining area and returned shortly with the card and a script signed with the doctor's name; that there was no writing on the script except the doctor's signature; that the receptionist wrote out the script and gave it to the woman charging her five dollars; that the woman asked to see the doctor for a minute and was refused; that the prescription was for thirty-six Ritalin tablets, ten milligrams, with the signa, one tablet twice daily; that Ritalin is the Schedule II controlled substance, Methylphenidate; that on this third visit no one examined the woman or took any medical history; that no one took or recorded her blood pressure; that no one took or recorded her weight; that no one took or recorded her temperature; that she never saw the doctor; that the doctor had no conversation with her; that the doctor never examined or touched the woman in any way. Now, Dr. Bond, based upon these facts, these three factual situations I have recited; and your experience as a medical expert, do you have an opinion satisfactory to yourself as to whether such a prescription was outside the usual course of a doctor's professional practice in this State?

*   *   *

A. Yes, sir.

Q. And what is that opinion?

*   *   *

A. My opinion is that it is outside the usual customary practice.

*  *  *

Q. And, Doctor, based upon these facts and your experience as a medical expert and medical practitioner, do you have an opinion satisfactory to yourself as to whether such a prescription was written for a legitimate medical purpose?

*  *  *

A. Yes, sir.

Q. What is that opinion, Doctor?

*  *  *

A. My opinion would be that it was not written for a legitimate medical purpose.

*  *  *

Q. Now, Doctor, based upon these facts and your experience as a medical practitioner and medical expert, do you have an opinion satisfactory to yourself as to whether the doctor in writing such a prescription was acting outside the normal course of a doctor's professional practice of medicine in this State?

*  *  *

A. Yes, sir.

Q. And what is that opinion?

*  *  *

A. My opinion is that he was acting outside the normal customary practice in this State.

*  *  *

Q. Doctor, on what do you base your opinion?

*  *  *

A. There again I think the primary thing is that it wasn't a legitimate medical reason to use it in this fashion, and there again also to use a medicine of this type even if the indications are good, certainly an adequate examination and history, adequate physical examination should be carried out.

*  *  *

Q. Doctor, if the jury should find as a fact from the evidence and beyond a reasonable doubt the facts that I have

recited to you in the last three hypothetical questions, and further that six days after the third visit the woman returned to the doctor's office for a fourth visit; that the woman entered the office, spoke to the receptionist and signed a patient register; that a nurse took her back into the examining area where she took her blood pressure and temperature readings and left the room; that the doctor entered the room directly after the nurse left stating, What can I do for you today? That the woman stated, The pills you've been giving me are making me nervous; that the doctor stated, What you should have done was skip a day and take a pill and I have some pills here that I will give you to calm you down; that the doctor left the examining room and met the woman at the receptionist desk; that the doctor came out with a clear plastic vial with a white top and placed it on the counter; that the vial contained a hundred fifteen small, white, single-scored tablets and bore a label in handwriting reading, One tablet before supper, two at bedtime; that the doctor said Here you are; that the woman paid eight dollars and left; that the tablets were the Schedule IV controlled substance, Phenobarbital. The doctor asked the woman no other questions except, What can I do for you today? and he never examined the woman or touched her in any way. Based on those facts, doctor, and your experience as a medical practitioner and as a medical expert, do you have an opinion satisfactory to yourself as to whether the delivery of Phenobarbital was outside the usual course of a doctor's professional practice in this State?

\*    \*    \*

A. Yes, sir.

Q. What is that opinion?

\*    \*    \*

A. My opinion is that it would be outside of the usual customary practice of a physician practicing in the State.

\*    \*    \*

Q. Now, Doctor, based on those facts again and your experience as a medical practitioner and medical expert, do you have an opinion satisfactory to yourself as to whether such delivery was for a legitimate medical purpose?

*    *    *    *

A. Yes, sir.

Q. What is the opinion?

*    *    *

A. My opinion would be that it was not for a legitimate medical purpose."

There was also evidence tending to show defendant's unlawful delivery of the controlled substance, Phenmetrazine, to two other S.B.I. agents.

Evidence for the defendant was as follows:

Defendant, Dr. Andrew Best, testified that he is a family practitioner who, on an average day, sees between eighty and ninety people. He has been practicing family medicine in Greenville for 21 years. The defendant was offered and found to be by the court an expert in the field of general practice.

The defendant testified that Agent Owens visited his office on several occasions using the alias of Martha Ann Taylor. On the initial visit her weight, blood pressure and temperature were taken and recorded by his nurse. The nurse assistant also recorded on the card that she, the agent, was working at night and needed something to stay awake. When defendant talked with the agent in the examining room he got the impression that she was working as a waitress on two jobs and that she had just moved to town. She told him that she had a tendency to fall asleep on her customers and that she was afraid that she would be fired if she didn't get something to control the situation. At this point, the defendant stated that he reviewed the clinical information on her weight, blood pressure and temperature and then formed the diagnostic impression that the patient was suffering from intermittent narcolepsy. He relied solely on her history in forming his diagnosis, and his treatment plan for the agent was to prescribe small controlled doses of Ritalin, monitoring results of the medication by getting information from the patient on return visits. He did prescribe Ritalin in ten milligram strength with instructions to take one tablet twice per day for eighteen days.

Agent Owens returned to the defendant's office on 27 February 1975, according to his testimony, twenty-three days after she had received her original prescription. Without seeing the

State v. Best

agent, the defendant wrote a refill prescription because his receptionist did not report any complaint of side effects or any other difficulty with the drug. On 19 March 1975, the agent returned to his office and asked for a third prescription for a refill. It was on this occasion that defendant told the agent, as he handed her the prescription for a refill, that she could not stay with this medication forever.

On 25 March 1975, the defendant saw and talked with the agent after his nurse had taken her blood pressure and temperature. On this occasion the agent complained of nervousness which she thought was a reaction to the Ritalin. Defendant asked the agent if she had stopped taking the drug, and the agent responded that she had. The defendant testified that he formed the diagnostic impression that the agent could very well have been having some side effects from the Ritalin. He stated that he determined that the agent should discontinue the use of Ritalin and should begin taking some Phenobarbital to control the symptoms she was experiencing from Ritalin. He testified that he prescribed and dispensed directly to the agent some Phenobarbital, which was in half grain tablet form, because he felt that by dispensing the drug directly to her that he could save her some money. Agent Owens paid $8.00 for the consultation and the Phenobarbital.

The defendant testified that he prescribed Ritalin and dispensed Phenobarbital to the agent for a legitimate medical purpose and that he believed that his conduct was within the normal course of professional practice of family medicine within this State. He stated that he did so in good faith based on representations made to him by the patient.

During cross-examination defendant was asked substantially the same hypothetical questions which were asked of the State's expert witness, Dr. Edward G. Bond. The defendant answered the first and last hypothetical questions in the same manner as Dr. Bond had, but disagreed with the State's witness on the second and third hypotheticals stating that he felt that these prescriptions had been written and delivered to Agent Owens for a legitimate medical purpose and that such conduct was within the normal course of professional practice in this State.

Defense expert witness Dr. Malene Grant Irons was asked substantially the same hypothetical questions by the prosecu-

tion as were asked of Dr. Bond. Dr. Irons answered the first three hypotheticals in the same manner as the State's witness Dr. Bond, but she found the facts set out in the fourth question to be within the normal course of professional practice in this State, except that she would have dispensed fewer Phenobarital tablets under the circumstances set forth in the fourth hypothetical.

Defense witness Dr. Jack Wilkerson, who was asked substantially the same four hypothetical questions, stated that in his opinion all of the prescribing and dispensing which had been described in the four hypotheticals had been done for legitimate medical purposes and within the usual course of a doctor's professional practice in this State.

Defendant's evidence also tends to show him to be a person of good character, one who enjoys a good reputation in the community and that he is a hardworking doctor and civic leader.

The jury returned a verdict of guilty on two of the six bills of indictment. The guilty verdicts related to the second and third visits by Agent Owens to defendant's office. He was acquitted in connection with the events that took place on the first and fourth visits. He was also acquitted on two other charges which related to alleged illegal delivery of drugs to two other agents.

Judgments imposing a twelve months' sentence were entered on both convictions. Each sentence was suspended upon the payment of a fine of $1,000.00 and costs.

*Attorney General Edmisten, by Associate Attorney Joan H. Byers, for the State.*

*James, Hite, Cavendish & Blount, by Marvin Blount, Jr., for defendant appellant.*

VAUGHN, Judge.

Defendant's first argument is that the court erred "in failing to find G.S. 90-86, et seq. [North Carolina Controlled Substances Act] to be so imprecise in delineating the parameters of the lawful prescription of controlled substances by a physician as to be unconstitutionally vague, and thus violative of the Fourteenth Amendment to the Constitution of the United States."

[1] In support of this argument, defendant contends that the act is inconsistent within itself in delineating when a physician's actions in the prescribing of drugs are lawful or unlawful. Defendant refers to the definitions given for a "Practitioner" and a "Prescription."

The statute defines a "Practitioner" as:

"a. A physician, dentist, veterinarian, scientific investigator, or other person licensed, registered or otherwise permitted to distribute, dispense, conduct research with respect to or to administer a controlled substance so long as such activity is within the normal course of professional practice or research in this State." G.S. 90-87(22)a.

A "Prescription" is defined as:

"a. A written order or other order which is promptly reduced to writing for a controlled substance as defined in this Article, or for a preparation, combination, or mixture thereof, issued by a practitioner who is licensed in this State to administer or prescribe drugs in the course of his professional practice; a prescription does not include an order entered in a chart or other medical record of a patient by a practitioner for the administration of a drug. . . ." G.S. 90-87(23)a.

Defendant's quarrel is with the use of "the normal course of professional practice" in the section defining a practitioner and "in the course of *his* professional practice" in the section defining a prescription. (Emphasis added.) We see no substance in the argument.

The clause "who is licensed . . . to . . . prescribe drugs in the course of his professional practice" in subsection (23)a is an adjective clause modifying the preceding noun "practitioner." It describes the one issuing the prescription. It does not change the definition of practitioner as given in subsection (22)a. A practitioner who is licensed to issue a prescription in the course of "his" professional practice may not do so unless that "activity is within the normal course of professional practice." In other words, a lawful prescription must be one that is issued by a practitioner, who is licensed to prescribe drugs in the course of his practice, within the normal course of professional practice in this State.

[2]  In further support of his first argument defendant contends that the statute is unconstitutionally vague because it forbids conduct in such terms that men of common intelligence must necessarily guess at their meaning and application.

The statute is explicit:

"Except as authorized by this Article, it is unlawful for any person:

(1) To manufacture, sell or deliver, or possess with intent to manufacture, sell or deliver, a controlled substance. . . ." G.S. 90-95(a)(1).

For perfectly obvious reasons a practitioner cannot be immune from the law solely because of his status. Defendant must bring himself within an exception to the foregoing prohibition. G.S. 90-113.1. He argues, nevertheless, that to allow conduct otherwise proscribed by the statute only if it is by a practitioner "within *the* normal course of professional practice" necessarily requires a finding of unconstitutionality. (Emphasis added.) The argument is without merit.

A practitioner who distributes drugs other than for a legitimate medical purpose within the normal course of professional practice has no more exemption from the law than does an illicit street vendor.

The term "within the normal course of professional practice" is not vague. It gives every practitioner fair notice of the standard he must follow if his conduct is to come within the exception of the statute. That is all the Constitution requires. *U. S. v. Moore*, 423 U.S. 122, 46 L.Ed. 2d 333, 96 S.Ct. 335; *U.S. v. Rosenburg*, 515 F. 2d 190, (9th Cir. 1975) *cert. den.* 423 U.S. 1031. *See also U. S. v. Collier*, 478 F. 2d 268 (5th Cir. 1973) and cases cited therein.

The clarity of the standard of conduct required and the burden placed on the State in this case is illustrated by the following excerpts from the judge's instruction to the jury:

"Now, within that term 'normal course of professional practice in this State,' there comes the question of what is normal. . . . The Court instructs you that the meaning you will apply in approaching this case as to the word 'normal' is as follows: Within a principle of right action binding upon the members of a group and serving to guide,

control or regulate proper and acceptable behavior of the members of that group.

\* \* \*

So, I charge you that if you find from the evidence and beyond a reasonable doubt that . . . the defendant, Andrew Arthur Best, knowingly, wilfully and intentionally delivered a prescription for Ritalin to Martha Owens for the sole purpose of keeping her awake while working jobs as waitresses and while working as a prostitute; and if you further find that such purpose was not in the normal course of a doctor's professional practice in North Carolina, and that as a result of the delivery of the prescription, Martha Owens obtained a quantity of Ritalin, a controlled substance, it would be your duty to return a verdict of guilty. If you fail to so find or have a reasonable doubt as to any one of those elements, you should give him the benefit of that doubt and you should acquit him.

\* \* \*

Now, ladies and gentlemen of the jury, when you come to consider the guilt or innocence of Dr. Andrew Best, the Court instructs you, as I have touched on before that a physician may in *good faith* and in *the course of his* professional practice within the State of North Carolina prescribe, administer and dispense narcotic drugs or have them administered by an assistant under his direct supervision. I further charge you that to determine *good faith* refers to the defendant's *honest belief* that the patient was suffering from a condition which required the administration of drugs in accordance with accepted medical practice. If you find that Dr. Andrew Best believed the prescription he issued served a legitimate medical purpose, then the dispensation or prescription or both of such controlled substances would not be unlawful, even though the doctor's medical judgment may have been faulty. You may not find absence of good faith on the part of Dr. Best beyond a reasonable doubt solely by reason of prescribed doses in excess of present needs. A physician violates the law when he prescribes drugs only if he does so without good faith, that is to say, only when in so prescribing he was acting outside the normal course of professional practice in the State.

* * *

The fact that the defendant may have made a medical mistake in prescribing the drugs does not establish that he failed to prescribe them in good faith. You are entitled to consider all of the circumstances surrounding the prescription or dispensation in question to determine whether the defendant acted in good faith, but if you find that the *defendant honestly thought* the prescription or dispensation would serve a legitimate medical purpose, then these prescriptions and dispensations would not be unlawful even if the defendant exhibited poor professional judgment." (Emphasis added.)

Defendant's second argument is that there is a fatal variance between the allegation that defendant distributed controlled substance not in the course of his professional practice and the proof and instruction to the jury that the distribution was not in the normal course of a doctor's professional practice in North Carolina. For the reasons we have indicated elsewhere in this opinion, we find no merit in the argument.

[3] Defendant's third and fourth arguments should be considered together. In the third, he contends the court erred in allowing to stand the verdicts of guilty as to the two prescriptions in view of the alleged inconsistent verdicts acquitting defendant on the indictment relating to the initial prescription on which the subsequent refills were based. In his fourth argument he contends the court erred in denying "the motion for judgment notwithstanding the verdict and to set aside the verdict as contrary to the weight of evidence." In support of the latter argument he stresses that the State's hypothetical questions tied the refills to the initial prescription with regard to which defendant was acquitted. He argues that when the jury acquitted defendant as to the initial prescription it necessarily rejected the evidence of its unlawfulness and that evidence was essential to the unlawfulness of the refills.

Both arguments require the same answer. A jury is not required to be consistent. *State v. Davis*, 214 N.C. 787, 1 S.E. 2d 104. Speaking through then Chief Judge Mallard, this Court has said:

"In short, defendant says that he was either guilty on both counts or not guilty on both counts. From the purely logical standpoint, this may or may not be true, but where the

evidence on each separate count was sufficient to support a conviction, we are not at liberty to speculate as to why a jury may convict on one count and not on another. 'In any event, a jury is not required to be consistent and mere inconsistency will not invalidate the verdict.' " *State v. Black,* 14 N.C. App. 373, 376, 377, 188 S.E. 2d 634.

There is evidence in this record sufficient to have supported a conviction on each of the charges for which defendant was tried. The jury was at liberty to accept or reject that evidence and the inferences arising thereon, in whole or in part.

The judge who presided over the trial denied defendant's motion to set the verdicts aside. These motions were addressed to his discretion. *State v. Moore,* 279 N.C. 455, 183 S.E. 2d 546. No abuse of discretion has been shown and, therefore, the decision of the trial judge is not reviewable on appeal. *State v. Bridgers,* 267 N.C. 121, 147 S.E. 2d 555.

We have carefully reviewed every assignment of error brought forward on this appeal. In these, defendant has failed to show any prejudicial errors of law that would require a reversal.

No error.

Judge MORRIS concurs.

Judge CLARK dissents.

Judge CLARK dissenting:

The jury by its verdict found the defendant not guilty of the charged violation in originally prescribing and dispensing Methylphenidate to Martha T. Owens, but guilty in refilling the prescription on her second and third visits to defendant's office. The time lapse between visits (23 days and 20 days) was such that the patient Owens would have consumed the 36 tablets of Methylphenidate at the rate of two per day as prescribed.

On the second and third visits to defendant's office for prescription refills Owens did not complain of any harmful effects from the drug. Thus, the defendant could reasonably

assume without further examination that the prescribed drug had no harmful effects upon her; that the drug had been effective in the treatment of the patient; and that refilling the prescription was justifiable under the circumstances.

To find the defendant guilty under the charge of the trial court, the jury had to find, from the evidence beyond a reasonable doubt, that defendant knowingly, wilfully and intentionally delivered the drug to the patient, not in the normal course of his professional practice and not in good faith. In my opinion the evidence was insufficient to support the verdicts of the jury, and the trial court erred in denying defendant's motion to set aside the verdicts.