PEOPLE v ALFORD

Docket No. 59557. Argued March 8, 1978 (Calendar No. 8).—Decided
        February 8, 1979.

Elvis Alford, M.D., was charged with unlawful delivery of con-
        trolled substances. An undercover police officer, acting upon
        information from an unidentified source, went to the defendant,
        posed as a patient, and complained of being overweight. The
        defendant gave the police officer a supply of medication and a
        prescription for amphetamines. The police officer made eight
        more visits to Dr. Alford and was given medication or prescrip-
        tions on these visits. The defendant also gave the police officer

---

REFERENCES FOR POINTS IN HEADNOTES

[1] 25 Am Jur 2d, Drugs, Narcotics, Poisons §§ 27.13, 39.

[2, 16, 17] 25 Am Jur 2d, Drugs, Narcotics, and Poisons §§ 37, 39.

[3] 25 Am Jur 2d, Drugs, Narcotics, and Poisons § 38.

[4] 25 Am Jur 2d, Drugs, Narcotics, and Poisons §§ 23, 41.

[5] 25 Am Jur 2d, Drugs, Narcotics, and Poisons §§ 10, 35, 38.

[6, 7] 21 Am Jur 2d, Criminal Law §§ 143-145.

   25 Am Jur 2d, Drugs, Narcotics, and Poisons § 43.

   75 Am Jur 2d, Trial § 727.

   Entrapment to commit offense with respect to narcotics law. 33
      ALR2d 886-902.

   Modern Status of the law concerning entrapment to commit narcot-
      ics offense-state cases. 62 ALR3d 121-148.

[8] 25 Am Jur 2d, Drugs, Narcotics, and Poisons §§ 23, 27.13, 35, 38.

[9] 23 Am Jur 2d, Drugs, Narcotics, and Poisons §§ 23.

[10, 12] 21 Am Jur 2d, Criminal Law §§ 143-145.

   25 Am Jur 2d, Drugs, Narcotics, and Poisons § 43.

   Entrapment to commit offense with respect to narcotic law. 33
      ALR2d 886-902.

   Modern status of the law concerning entrapment to commit narcot-
      ics offense-state cases. 62 ALR3d 121-148.

[11] 75 Am Jur 2d, Trial § 425.

   Entrapment to commit offense with respect to narcotic law. 33
      ALR2d 902-908.

[13, 14, 18, 20] 21 Am Jur 2d, Criminal Law § 17.

   73 Am Jur 2d, Statutes § 346.

[15] 73 Am Jur 2d, Statutes §§ 224-227.

[16] 73 Am Jur 2d, Statutes §§ 145, 146, 236.

[19] 73 Am Jur 2d, Statutes § 295.

prescriptions for controlled substances in the names of fictitious persons given by the officer. The Wayne Circuit Court, Victor J. Baum, J., quashed the information on the grounds that the statutory term "delivery" does not include the prescribing of drugs by a licensed physician, that the statute permits physicians to dispense controlled drugs even if the physician's conduct does not comply with the standards of his profession, and that the police conduct in the matter constituted entrapment as a matter of law. The Court of Appeals, Bashara, P.J., and N. J. Kaufman and D. F. Walsh, JJ., reversed (Docket No. 20741). Defendant appeals. *Held:*

1. Prescribing and handing or dispensing pills are included within the definition of "deliver" in the Controlled Substances Act.

2. The blanket prohibition of the statute on the delivery of controlled substances by "any person" is clear. "Person" does not exclude physicians or any other group. This categorical approach is consistent with the legislative desire to establish the most comprehensive system to regulate controlled substances.

3. A physician has a limited statutory exemption from prosecution. To maintain the exemption he must be in compliance with his registration under the Controlled Substances Act and conform to the other provisions of the act. The definition of a "practitioner" requires a physician to act in good faith "in the course of professional practice or research" to retain the limited exemption. The defendant contends that the statute establishes a separate penal system for persons registered under the act. However, in the context of the statute "registrant" is merely a limiting term, indicating that the only persons who are subject to certain provisions of the Controlled Substances Act are "registrants". There is no indication that "persons" means "nonregistrants" in the other provisions of the act. Therefore, a physician dispensing controlled substances not in the course of professional practice or research can be prosecuted for unlawful delivery of a controlled substance. Whether a physician is acting in good faith in the course of professional practice or research is a question of fact.

4. The "objective" standard of entrapment previously adopted by the Court does not preclude the use of undercover agents by the police, but only police conduct which is so reprehensible that it cannot be condoned by the judicial system. The defendant in this case has failed to sustain his burden of proving entrapment by a preponderance of the evidence. The police officer did not attempt to create any special friendship with the

defendant to facilitate a delivery of drugs; he did not cajole or induce the doctor to give him drugs. He merely presented himself at the defendant's office and asked for drugs, which he · received. As a matter of law, the defendant was not entrapped.

Affirmed.

Justice Levin, joined by Justice Kavanagh, dissented.

1. A physician is not immune per se from prosecution under the Controlled Substances Act because he is a registrant. When a physician delivers drugs, not as a physician, but as a pusher, he is subject to prosecution. It does not follow that because a physician may not traffic in drugs he can be prosecuted for simple departures from generally accepted standards of professional practice and ethics. Carelessness, bad judgment, or malpractice is one thing; intent to traffic in drugs and distributing in bad faith for a non-medical purpose is quite another. The proper standard for determining responsibility under the unlawful delivery provision of the Controlled Substances Act is the subjective standard, whether the physician has in good faith dispensed or prescribed for a medical purpose. The prosecution must show that the physician did not dispense or prescribe in good faith for what he perceived to be a medical purpose. Evidence of a non-medical purpose must be adduced.

2. The Supreme Court has adopted the objective test of entrapment, focusing on the propriety of the police conduct which led to the criminal activity rather than the defendant's predisposition to engage in proscribed activity. The circuit judge applied the test and made specific findings, concluding that the officer persisted in a repeated course of conduct after the first visit which was calculated to induce and instigate the commission of an offense which would not have occurred but for his persistent, clever, persuasive, and deceptive efforts. When those findings are reviewed by the "clearly erroneous" standard which the Court has held to apply, it cannot be said that one is left with the definite and firm conviction that a mistake has been committed. The quashing of the information should be affirmed on the ground that the judge did not clearly err in finding entrapment.

Justice Kavanagh signed Justice Levin's opinion because he agreed that the trial court's decision that the defendant was entrapped is not clearly erroneous. He wrote separately, however, to state that he disagreed with the implication that the statute as written in 1971 can constitutionally be applied to physicians. A criminal statute ought to be so plain and unambiguous that "he who runs" may read, and understand whether his conduct is in violation of its provisions. He is satisfied that

this statute as applied to physicians is too vague to pass constitutional muster.

Justice Moody, concurring in part, agreed with Justice Williams as to the issue of entrapment, but would hold that the terms "prescribing" and "dispensing" by a registered physician cannot be equated with the term "delivery" under the Controlled Substances Act.

1. The Michigan Controlled Substances Act, unlike its Federal counterpart, does not include the word dispensing or its corollary, prescribing, in the definition of delivery. This indicates an intent by the Legislature not to equate the term delivery with the terms dispensing or prescribing. Furthermore, one statutory provision regulates the delivery of drugs and another regulates the dispensing and prescribing of drugs. Had the Legislature intended to subject doctors to liability under both sections, it could have said so plainly.

2. Recent amendments to the Controlled Substances Act make it obvious that the Legislature now intends that practitioners, including doctors, can be liable under both provisions of the act. If the Legislature had intended mere clarification and, therefore, retroactive application, it would have said so.

3. The Controlled Substances Act does not give a standard by which to measure the culpability of a physician. The argument that a physician must act "in the course of professional practice" to retain the limited exemption from criminal liability is faulty for three reasons. First, any limitation on the exemption must be found in the same chapter of the act, rather than in another chapter as a part of a definition of the term "practitioner". Second, the phrase "in the course of professional practice" occurs at the end of the definition of "practitioner", 65 words after the word "physician". Therefore, the phrase was only intended to modify the clause immediately preceding it concerning a license to administer a controlled substance. This construction is in accord with the basic rule that a criminal statute should be construed in favor of the accused. Third, the phrase is vague, neither connoting an objective standard of culpability nor a subjective standard. The nebulous phrase is, therefore, fatally defective.

73 Mich App 604; 251 NW2d 314 (1977) affirmed.

OPINION OF THE COURT

1. DRUGS AND NARCOTICS — CONTROLLED SUBSTANCES ACT — "DE-
LIVER" — PRESCRIPTION — WORDS AND PHRASES.
Prescribing of a controlled substance is included in the definition

of "deliver" in the Controlled Substances Act (MCL 335.304; MSA 18.1070[4]).

2. DRUGS AND NARCOTICS — CONTROLLED SUBSTANCES ACT — "DE- LIVER" — HANDING — DISPENSING — WORDS AND PHRASES.

Handing or dispensing pills containing controlled substances is included within the definition of "deliver" in the Controlled Substances Act (MCL 335.304; MSA 18.1070[4]).

3. DRUGS AND NARCOTICS — CONTROLLED SUBSTANCES ACT — PERSONS — PHYSICIANS AND SURGEONS — WORDS AND PHRASES.

"Person" as defined by the Controlled Substances Act does not exclude physicians or any other group; the definition is consist- ent with the legislative desire to establish the most comprehen- sive system of controls to regulate controlled substances (MCL 335.307[1]; MSA 18.1070[7][1]).

4. DRUGS AND NARCOTICS — CONTROLLED SUBSTANCES ACT — PHYSI- CIANS AND SURGEONS — EXEMPTION.

Physicians possess a limited statutory exemption from prosecu- tion under the Controlled Substances Act in dispensing or prescribing controlled substances, but they must act in the course of their professional practice or research to retain that exemption; whether a physician or other practitioner is acting in the course of professional practice or research is a question of fact (MCL 335.307[3][a], 335.332[2]; MSA 18.1070[7][3][a], 18.1070[32][2]).

5. DRUGS AND NARCOTICS — CONTROLLED SUBSTANCES ACT — PERSON — REGISTRANT — WORDS AND PHRASES.

"Registrant" is merely a limiting term in certain provisions of the Controlled Substances Act which indicates that the only "persons" who are subject to those provisions of the act are registrants; there is no indication in the act that "persons" means "nonregistrants" in the context of the other provisions of the act (MCL 335.307[1], 335.342[1][b]; MSA 18.1070[7][1], 18.1070[42][1][b]).

6. CRIMINAL LAW — ENTRAPMENT — POLICE CONDUCT.

The adoption of the objective standard of entrapment does not preclude the use of undercover agents by the police, but only police conduct so reprehensible that it cannot be condoned by the judicial system.

7. DRUGS AND NARCOTICS — DELIVERY — ENTRAPMENT — POLICE CONDUCT.

A defendant physician charged with delivering a controlled sub-

stance to an undercover police officer failed to prove his claim of entrapment where the police officer did not attempt to create any special friendship with the physician to facilitate a delivery of drugs, and did not cajole or induce the physician to give him drugs, but merely presented himself at the physician's office and asked for drugs, which he received.

DISSENTING OPINION BY LEVIN, J.

8. DRUGS AND NARCOTICS — CONTROLLED SUBSTANCES ACT — PHYSI-CIANS AND SURGEONS — DELIVERY.

*A physician, or other registrant under the Controlled Substances Act, is not immune from prosecution for delivery of a controlled substance simply because he is a registrant; when a physician delivers drugs, not as a physician, but as a pusher, he is subject to prosecution (MCL 335.341; MSA 18.1070[41]).*

9. DRUGS AND NARCOTICS — CONTROLLED SUBSTANCES ACT — PHYSI-CIANS AND SURGEONS — DELIVERY.

*The proper standard for determining a physician's criminal responsibility under the Controlled Substances Act for delivery of a controlled substance is the subjective standard of whether the physician has in good faith dispensed or prescribed for a medical purpose; the prosecution must show that the physician did not dispense or prescribe in good faith for what he perceived to be a medical purpose, and evidence of a nonmedical purpose must be adduced (MCL 335.307[3], 335.332, 335.341; MSA 18.1070[7][3], 18.1070[32], 18.1070[41]).*

10. CRIMINAL LAW — ENTRAPMENT — POLICE CONDUCT.

*The test of entrapment is an objective one, focusing on the propriety of police conduct rather than the defendant's predisposition to engage in the proscribed activity.*

11. CRIMINAL LAW — ENTRAPMENT — QUESTION OF LAW — APPEAL AND ERROR.

*Whether a defendant was entrapped is a question for the trial court; the trial court's finding is subject to appellate review under the clearly erroneous standard.*

12. DRUGS AND NARCOTICS — DELIVERY — ENTRAPMENT — POLICE CONDUCT.

*A trial court did not err in finding that a physician had been entrapped by an undercover police officer where the court found that the officer persisted in a repeated course of conduct, eight or nine visits to the physician for the sole purpose of*

*encouraging him to make an unlawful delivery of controlled substances, which after the first visit was calculated to induce and instigate the commission of an offense which would not have occurred but for the officer's persistent, clever, persuasive, and deceptive efforts.*

DISSENTING OPINION BY KAVANAGH, J.

See headnotes 10-12.

13. CRIMINAL LAW — STATUTES — CONSTITUTIONAL LAW.

*A criminal statute ought to be so plain and unambiguous that "he who runs" may read, and understand whether his conduct is in violation of its provisions.*

14. DRUGS AND NARCOTICS — CONTROLLED SUBSTANCES ACT — PHYSICIANS AND SURGEONS — DELIVERY — CONSTITUTIONAL LAW.

*The Controlled Substances Act as written in 1971 as applied to physicians was too vague to pass constitutional muster (MCL 335.341; MSA 18.1070[41]).*

DISSENTING OPINION BY BLAIR MOODY, JR., J.

See headnotes 6, 7.

15. DRUGS AND NARCOTICS — CONTROLLED SUBSTANCES ACT — DELIVERY — DISPENSING — PRESCRIPTION — WORDS AND PHRASES.

*The Michigan Controlled Substances Act, unlike its Federal counterpart, does not include the word dispensing or its corollary, prescribing, in the definition of delivery; it indicates an intent by the Legislature not to equate the term delivery with the terms dispensing or prescribing (MCL 335.304; MSA 18.1070[4]).*

16. DRUGS AND NARCOTICS — CONTROLLED SUBSTANCES ACT — DELIVERY — DISPENSING — PRESCRIPTION — PHYSICIANS AND SURGEONS.

*One provision of the Controlled Substances Act, before its amendment in 1978, regulated the delivery of drugs and another regulates the dispensing and prescribing of drugs; had the Legislature intended to subject physicians to liability under both sections, it could have said so plainly (MCL 335.341, 335.342; MSA 18.1070[41], 18.1070[42]).*

17. DRUGS AND NARCOTICS — CONTROLLED SUBSTANCES ACT — DELIVERY — DISPENSING — PRESCRIPTION — PHYSICIANS AND SURGEONS.

*Amendments to the Controlled Substances Act make it obvious that the Legislature now intends that practitioners, including doctors, can be liable under both the delivery and dispensing provisions of the act; if the Legislature had intended mere clarification and, therefore, retroactive application, it would have said so (1978 PA 147).*

18. DRUGS AND NARCOTICS — CONTROLLED SUBSTANCES ACT — PHYSICIANS AND SURGEONS — EXEMPTION.

*The Controlled Substances Act does not give a standard by which to measure the culpability of a physician; the argument that a physician must act "in the course of professional practice" to retain the limited exemption from criminal liability is faulty for three reasons: by the wording of the exemption, any limitation on it must be found in the same chapter of the act, and the words "in the course of professional practice" are found in a different chapter; the phrase was not intended to modify the word "physician" but only the clause immediately preceding the phrase; the phrase is vague, connoting neither an objective nor a subjective standard of culpability (MCL 335.307[3][a], 335.332[2]; MSA 18.1070[7][3][a], 18.1070[32][2]).*

19. CRIMINAL LAW — STATUTES — CONSTRUCTION.

*A criminal statute should be construed in favor of the accused.*

20. DRUGS AND NARCOTICS — CONTROLLED SUBSTANCES ACT — PHYSICIANS AND SURGEONS — STANDARD OF CULPABILITY.

*The phrase "in the course of professional practice" is vague, neither connoting an objective standard of culpability for physicians under the Controlled Substances Act nor a subjective standard; the nebulous phrase is, therefore, fatally defective (MCL 335.307[3][a]; MSA 18.1070[7][3][a]).*

*Frank J. Kelley,* Attorney General, *Robert A. Derengoski,* Solicitor General, *William L. Cahalan,* Prosecuting Attorney, *Edward Reilly Wilson,* Principal Attorney, Appeals, and *Larry L. Roberts,* Assistant Prosecuting Attorney, for the people.

*Cyril Abramson* for defendant.

Amicus Curiae:

*Henry B. Rothblatt (Peres, Carr, Jacques, Batchik & Schmidt,* of counsel) for Albert Jack Berg, D.O.

WILLIAMS, J. We are presented with three issues. First is whether there is a delivery under the Michigan Controlled Substances Act (1971 PA 196, MCL 335.341; MSA 18.1070[41] when a physician gives a prescription or dispenses a box of pills. Second is whether a licensed physician can be prosecuted under MCL 335.341(1)(b); MSA 18.1070(41)(1)(b), for unlawful delivery of a controlled substance. The third is whether as a matter of law the defense of entrapment was established.

The appellant, Dr. Alford, was charged with two counts of unlawful delivery of a controlled substance. The first count was for giving prescriptions for 120 capsules containing amphetamines to an undercover police officer in the names of persons never examined by the doctor. The second count was for actually giving 103 capsules containing barbiturates to the same undercover police officer.

The trial court granted a pretrial motion to quash the information finding (1) physicians dispensing and/or prescribing controlled substances are not subject to prosecution under MCL 335.341(1)(b); MSA 18.1070(41)(1)(b) and (2) the appellant was entrapped as a matter of law. The Court of Appeals reversed on both grounds, *People v Alford,* 73 Mich App 604; 251 NW2d 314 (1977).

In *People v Kerwin,* 56 Mich App 483; 224 NW2d 113 (1974), a panel of the Court of Appeals held physicians were not subject to prosecution under MCL 335.341(1)(b); MSA 18.1070(41)(1)(b). The opposite conclusion was reached by the Court in *Alford.*

We granted leave to appeal August 31, 1977, 401 Mich 804 (1977), to resolve a conflict in the Court of Appeals.

We agree with the holding of the Court of Appeals in *Alford.* Physicians not acting in good faith "in the course of professional practice or research" are prosecutable under MCL 335.341(1); MSA 18.1070(41)(1). We also agree with their determination that the defense of entrapment was not established as a matter of law.

We affirm the Court of Appeals in *Alford.*

## I. FACTS

On March 12, 1973, Justin Kukalis, an officer of the Department of State Police, Intelligence Division, Diversion Investigation Unit, visited Dr. Alford at his office. Kukalis posed as a patient and gave the name James Kase. He complained of being overweight. The doctor weighed him and took his blood pressure by placing the blood pressure cuff over his jacket on his arm. The doctor gave him medication[1] (92 small white and 30 small flat pink double-scored tablets) and a prescription for 30 amphetamine capsules. He did not tell him what the medication was, but gave him directions on dosage, one tablet a day. The doctor told him to return in two weeks. Officer Kukalis paid for the visit.[2]

As noted by the trial court:

"Kukalis returned on approximately eight or nine occasions thereafter, and on these occasions he was not

---

[1] When the doctor gave Officer Kukalis medication he usually poured the pills into his own hand and then into a small packet or box. He did not count the pills. The number of pills supplied was taken from the testimony of Officer Kukalis.

[2] Officer Kukalis paid for all subsequent visits to Dr. Alford.

given a further medical examination, although on some of the return visits he was weighed and on others he was asked about his weight.

"On these occasions when Kukalis returned to Dr. Alford's office, Dr. Alford usually handed Kukalis drugs containing amphetamines. On some occasions he handed Kukalis drugs containing barbiturates, and on some of these occasions he wrote prescriptions for Kukalis for amphetamine drugs."

On June 1, 1973, Kukalis went to the doctor's office. The doctor informed Kukalis he had no amphetamines available and that he did not like writing prescriptions so often. The doctor then wrote a prescription for Kukalis for 30 amphetamine capsules. The doctor asked who else needed a prescription. Kukalis supplied the names and addresses of fictitious people, Neil Harris and Karen Kase. The doctor wrote prescriptions for them. Kukalis then supplied the name Donald Hollis and the doctor supplied an address as he wrote the prescription. Kukalis also requested and received a small white box of red capsules, 59, and some blue and clear capsules, 43.

The four prescriptions received by Kukalis from Dr. Alford on June 1, 1973 were filled by a drug inspector in the Department of Licensing and Regulation assigned to the Diversion Investigation Unit. The drug inspector was a pharmacist. The contents of each prescription were analyzed by the Michigan State Police Scientific Laboratory. Each prescription was for amphetamine sulphate, 30 capsules, a schedule 2 controlled substance.

The medication directly received by Kukalis on June 1, 1973 was also analyzed by the Michigan State Police Scientific Laboratory. The 59 orange capsules contained secobarbital, a schedule 3 controlled substance. The 44 blue and clear capsules

contained amobarbital, also a schedule 3 controlled substance.

Based on the drugs received on June 1, 1973, a two-count information was filed against Dr. Alford charging that he (1) "did unlawfully deliver a controlled substance, to-wit: 120 capsules containing amphetamine, contrary to the provisions of MCL 335.341(1)(b);" and (2) "did unlawfully deliver a controlled substance, to-wit: 103 capsules containing barbituates *[sic]*, contrary to the provisions of MCL 335.341(1)(b)".

After the preliminary examination the defendant was bound over for trial on both counts. The defendant filed a motion to quash the information which was granted by the trial court. The judge held that writing prescriptions was not a delivery or constructive delivery within the meaning of MCL 335.341(1)(b); MSA 18.1070(41)(1)(b). The judge also held:

"that this statute either frees licensed physicians, without qualification, to hand out barbiturate drugs, or it permits them to hand out such drugs to people who come to their offices for professional consultation regardless of whether the physicians' conduct falls short of the standards of skill, care and ethics customarily employed by their co-professionals."

In conclusion the judge found:

"as a matter of law, that the defendant was entrapped."

The Court of Appeals reversed the decision of the trial court holding

"that a practitioner is not exempt from prosecution under MCL 335.341(1); MSA 18.1070(41)(1), merely because of his registered status. The practitioner's activi-

ties are only protected to the extent they are performed within the course of professional practice." 73 Mich App 604, 614.

The Court also found that

"[t]he facts in the case at bar do not indicate the government conduct was of such a nature as to give rise to a finding of entrapment." 73 Mich App 604, 615.

## II. APPLICABLE PORTIONS OF THE CONTROLLED SUBSTANCES ACT OF 1971

MCL 335.341; MSA 18.1070(41) establishes the basic penalties for violation of the Controlled Substances Act of 1971 and provides in pertinent part:

"(1) Except as authorized by this act, it is unlawful for any person to manufacture, deliver or possess with intent to manufacture or deliver, a controlled substance. Any person who violates this subsection with respect to:

\* \* \*

"(b) Any other controlled substance classified in schedules 1, 2 or 3, except marihuana, is guilty of a felony and upon conviction may be imprisoned for not more than 7 years or fined not more than $5,000.00, or both."[3]

Specific definitions are provided for the terms used in this section:

---

[3] The Commissioners' Note to the Uniform Controlled Substances Act, § 401, the counterpart to our MCL 335.341; MSA 18.1070(41) states:

"The term 'delivery' as used in this Section is intended to include both dispensing and distribution as they are defined in Section 101." 9 ULA, Matrimonial, Family and Health Laws, Master Edition, p 267.

Our definition of dispense, MCL 335.304(2); MSA 18.1070(4)(2) parallels the Uniform Controlled Substances Act, § 101(g).

" 'Person' means an individual, corporation, government or governmental subdivision or agency, business trust, estate, trust, partnership or association, or any other legal entity." MCL 335.307(1); MSA 18.1070(7)(1).

" 'Deliver' or 'delivery' means the actual, constructive or attempted transfer from 1 person to another of a controlled substance, whether or not there is an agency relationship." MCL 335.304(1); MSA 18.1070(4)(1).

These provisions must be considered in light of other sections relating to physicians:

" 'Practitioner' means:

"(a) A physician, dentist, veterinarian or pharmacist as defined in subdivisions (o), (p), (q) and (w) of section 1 of Act No. 151 of the Public Acts of 1962, as amended, being section 338.1101 of the Compiled Laws of 1948, scientific investigator as defined by rule of the administrator, or other person licensed, registered or otherwise permitted to distribute, dispense, conduct research with respect to or to administer a controlled substance *in the course of professional practice* or research in this state." (Emphasis added.)  MCL 335.307(3); MSA 18.1070(7)(3).

" 'Dispense' means to deliver or issue a controlled substance to an ultimate user or research subject by or pursuant to the lawful order of a practitioner, including the prescribing, administering or compounding necessary to prepare the substance for that delivery or issuance." MCL 335.304(2); MSA 18.1070(4)(2).

"(1) Every person who manufactures, distributes, prescribes or dispenses any controlled substance within this state or who proposes to engage in the manufacture, distribution, prescribing or dispensing of any controlled substance within this state, shall obtain annually a registration issued by the administrator in accordance with its rules.

"(2) Persons registered by the administrator under this act to manufacture, distribute, prescribe, dispense or conduct research with controlled substances may possess, manufacture, distribute, prescribe, dispense or

conduct research with those substances to the extent authorized by their registration and in conformity with the other provisions of this chapter." MCL 335.332; MSA 18.1070(32).

These sections provide the focal point of our analysis.

### III. "DELIVERY" UNDER THE ACT

Counts 1 and 2 charged defendant "did unlawfully deliver a controlled substance". For Count 1, the proofs were that defendant wrote prescriptions for Officer Kukalis and for three fictitious people, with the defendant supplying a fictitious address for the last one. For Count 2, the proofs were that defendant handed or dispensed to Officer Kukalis a box of pills.

Therefore two questions relating to delivery exist: A. Is prescribing delivery? B. Is handing/dispensing delivery?

### A. Prescribing

MCL 335.304(1); MSA 18.1070(4)(1), as noted above, reads in part: " 'Deliver' * * * means the actual, constructive or attempted transfer * * * of a controlled substance". MCL 335.304(2); MSA 18.1070(4)(2), as noted above, reads in part: " 'Dispense' means to deliver * * * by or pursuant to the lawful order of a practitioner, including the prescribing * * *". As a consequence, prescribing is included in the definition of deliver.

### B. Handing/Dispensing

The two statutory definitions examined in *A. Prescribing* also demonstrate that handing or dis-

pensing pills is included within the definition of
"deliver".

## IV. APPLICATION TO PHYSICIANS

The statute prohibits "any person" from deliver-
ing a controlled substance. This blanket prohibi-
tion by itself would prevent physicians from dis-
pensing any medication.

The statutory restriction on the delivery of con-
trolled substances is clear. The term "person" as
defined by the statute[4] does not exclude physicians
or any other group. We find this categorical ap-
proach consistent with the legislative desire to
establish the most comprehensive system of con-
trols to regulate the use and abuse of controlled
substances.

Physicians, however, do possess a limited exemp-
tion from prosecution in MCL 335.332(2); MSA
18.1070(32)(2) which states:

"Persons registered by the administrator under this
act to manufacture, distribute, prescribe, dispense or
conduct research with controlled substances may pos-
sess, manufacture, distribute, prescribe, dispense or
conduct research with those substances to the extent
authorized by their registration and in conformity with
the other provisions of this chapter."

To maintain their exemption they must be in
compliance with their registration under the act
and conform to the other provisions of the act.

But MCL 335.307(3)(a); MSA 18.1070(7)(3)(a) pro-
vides a limitation on their license to dispense
controlled substances. This section defines a "prac-
titioner" to include:

---

[4] MCL 335.307(1); MSA 18.1070(7)(1).

"A physician, * * * or other person licensed, registered or otherwise permitted to distribute, dispense, conduct research with respect to or to administer a controlled substance *in the course of professional practice* or research in this state." (Emphasis added.)

Therefore physicians must act "in the course of professional practice or research" to retain their limited exemption.

We find support for our interpretation of the Controlled Substances Act of 1971 in *United States v Moore,* 423 US 122; 96 S Ct 335; 46 L Ed 2d 333 (1975). In *Moore* a licensed physician registered under the Federal Controlled Substances Act, 21 USC 801 *et seq.,* was convicted of a violation of 21 USC 841(a)(1) which made it:

"unlawful for any person knowingly or intentionally— * * * to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance;".[5]

Our act substantially parallels the Federal Controlled Substances Act, 21 USC 801 *et seq.*[6]

[5] Compare this language with MCL 335.341; MSA 18.1070(41):

"[I]t is unlawful for any person to manufacture, deliver or possess with intent to manufacture or deliver, a controlled substance."

21 USC 841 includes the word "dispense" and the Michigan section does not. But Michigan follows the Uniform Controlled Substances Act which considers dispensing a part of delivery. See footnote 3.

[6] The Federal act was the first major overhaul of drug laws to occur in 20 years. It provided the impetus for the adoption of the Uniform Controlled Substances Act in some form by 45 jurisdictions including Michigan. The Commissioners' Prefatory Note to the Uniform Controlled Substances Act states:

"This Uniform Act was drafted to achieve uniformity between the laws of the several States and those of the Federal government. It has been designed to complement the new Federal narcotic and dangerous drug legislation and provide an interlocking trellis of Federal and State law to enable government at all levels to control more effectively the drug abuse problem." 9 ULA, p 146.

The United States Supreme Court extensively analyzed the Federal Controlled Substances Act and its legislative history and held:

"that registered physicians can be prosecuted under § 841 when their activities fall outside the usual course of professional practice." 423 US 122, 124.

An interesting question raised by defendant is whether he can be prosecuted under MCL 335.341; MSA 18.1070(41) in light of MCL 335.342; MSA 18.1070(42) which provides:

"(1) It is unlawful for any person:

"(a) Who is subject to chapter 3, to distribute, prescribe or dispense a controlled substance in violation of section 38.

"(b) Who is a registrant, to manufacture a controlled substance not authorized by his registration, or to distribute, prescribe or dispense a controlled substance not authorized by his registration to another registrant or other authorized person, except as authorized by rules promulgated by the administrator.

\* \* \*

"(2) Any person who violates this section may be punished by a civil fine of not more than $25,000.00 in a proceeding in the circuit court. However, if the violation is prosecuted by a criminal indictment which alleges that the violation was committed knowingly or intentionally, and the trier of the fact specifically finds that the violation was committed knowingly or intentionally, such person is guilty of a misdemeanor and upon conviction may be imprisoned for not more than 2 years or fined not more than $25,000.00, or both."

Defendant contends that MCL 335.342; MSA 18.1070(42) establishes a separate and distinct penal system for persons registered under the act.

This very point was considered in *Moore* because 21 USC 842 is comparable to MCL 335.342; MSA

18.1070(42). *Moore* was decided adversely to defendant.

"Respondent nonetheless contends that §§ 841 and 822(b) must be interpreted in light of a congressional intent to set up two separate and distinct penalty systems: Persons not registered under the Act are to be punished under § 841, while those who are registered are to be subject only to the sanctions of §§ 842 and 843. The latter two sections, the argument goes, establish modest penalties which are the sole sanctions in a system of strict administrative regulation of registrants.
"The operative language of those sections provides no real support for the proposition that Congress intended to establish two mutually exclusive systems. It is true that the term 'registrants' is used in §§ 842 and 843, and not in § 841. But this is of limited significance. All three sections provide that '[i]t shall be unlawful for any person * * * [to commit the proscribed acts].' Two of the eight subsections of § 842(a), one of the five subsections of § 843(a) and § 842(b) further qualify 'any person' with 'who is a registrant.' The other subsections of §§ 842 and 843 are not so limited. In context, 'registrant' is merely a limiting term, indicating that the only 'persons' who are subject to these subsections are 'registrants.' There is no indication that 'persons' means 'nonregistrants' when introducing the other subsections." 423 US 122, 133-134.

The United States Supreme Court decision in *Moore* has been used by two jurisdictions to support a finding that physicians are subject to prosecution for violations similar to those in the instant case.

In *State v Vaccaro,* 142 NJ Super 167, 173; 361 A2d 47 (1976), the Court stated:

"A physician who is honest and ethical, and dispenses the prohibited drugs in a good faith effort to treat and cure patients, has no fear of the criminal sanctions of the statute. However, his mere status as a licensed

physician who has been properly registered as a dispenser of the prohibited drugs does not give him the blanket right to abuse his authority and profession by dispensing drugs without relation to his sworn professional obligations."

In *State v Fearing,* 30 Md App 134; 351 A2d 896 (1976), the Court reached the same conclusion.

We hold that physicians can dispense controlled substances only

"to the extent authorized by their registration and in conformity with the other provisions of this chapter." MCL 335.332(2); MSA 18.1070(32)(2).

A physician dispensing controlled substances not in the course of professional practice or research can be prosecuted for unlawful delivery of a controlled substance. Whether a physician or any other person listed in MCL 335.307(3)(a); MSA 18.1070(7)(3)(a) is acting in good faith in the course of professional practice or research is a question of fact.[7]

## V. ENTRAPMENT

This Court in *People v Turner,* 390 Mich 7; 210 NW2d 336 (1973), adopted the objective test for entrapment articulated by Justice Stewart's dissenting opinion in *United States v Russell,* 411 US 423; 93 S Ct 1637; 36 L Ed 2d 366 (1973). This test focuses on

---

[7] In *Moore* the United States Supreme Court noted that:

"The jury was instructed that Dr. Moore could not be convicted if he merely made 'an *honest effort'* to prescribe for detoxification in compliance with an accepted standard of medical practice. App. 124." 423 US 122, 142, fn 20 (emphasis added).

An "honest effort" or good faith compliance is the standard required in determining whether the physician's actions were in the course of professional practice or research.

"whether the actions of the police were so reprehensible under the circumstances, that the Court should refuse, as a matter of public policy, to permit a conviction to stand." 390 Mich 7, 22.

The adoption of the objective standard does not automatically preclude the use of undercover agents, but only conduct so reprehensible that it cannot be condoned by the judicial system. After discussing the objective standard of entrapment, Justice Stewart noted in his dissent in *Russell:*

"This does not mean, of course, that the Government's use of undercover activity, strategy, or deception is necessarily unlawful. *Lewis v United States,* 385 US 206, 208-209 [87 S Ct 424; 17 L Ed 2d 312] (1966). Indeed, many crimes, especially so-called victimless crimes, could not otherwise be detected. Thus, government agents may engage in conduct that is likely, when objectively considered, to afford a person ready and willing to commit the crime an opportunity to do so. *Osborn v United States,* 385 US 323, 331-332 [87 S Ct 429; 17 L Ed 2d 394] (1966). See also *Sherman v United States* [356 US 369, 383-384; 78 S Ct 819; 2 L Ed 2d 848 (1958)]. (Frankfurter, J., concurring)." 411 US 423, 445.

In *People v D'Angelo,* 401 Mich 167; 257 NW2d 655 (1977), we made it clear that

"[t]he policy considerations which moved us to adopt the objective test of entrapment compel with equal force the conclusion that the judge and not the jury must determine its existence. The thesis is that law enforcement conduct which essentially manufactures crime is a corruptive use of governmental authority which, when used to obtain a conviction, taints the judiciary which tolerates its use. It is a practice which relies for its success upon judicial indifference, if not approval, and it must be deterred. Its deterrence is a duty which transcends the determination of guilt or innocence in a given case and stands ultimately as the

responsibility of an incorruptible judiciary." 401 Mich
167, 173-174.

In *D'Angelo* we also defined the burden of proof
required and the standard to be used on review:

"We hold therefore that the defendant shall have the
burden of proving the claim of entrapment by a prepon-
derance of the evidence.

\*   \*   \*

"The trial court's finding will be subject to appellate
review under the clearly erroneous standard." 401 Mich
167, 183.

Defendant in this case failed to make a case of
entrapment. Officer Kukalis did not attempt to
create any special friendship with the doctor to
facilitate a delivery of drugs. He did not cajole or
induce the doctor to give him drugs. Officer Ku-
kalis merely presented himself at the doctor's
office and asked for drugs, which he received. The
conduct of the police in this case certainly did not
approach the extreme situation we viewed in
*Turner.* The undercover police officer in *Turner*
worked for three years to establish a friendship
with the defendant and then manufactured sad
stories to obtain his sympathy.

The factual situation presented in the instant
case does not reveal actions of the police so repre-
hensible that they should be excluded from the
judicial administration of criminal justice.

We find as a matter of law that defendant was
not entrapped.

## V. CONCLUSION

We hold physicians are subject to prosecution
under MCL 335.341; MSA 18.1070(41) for unlawful

delivery of a controlled substance when they are not within the authorization granted by their registration or in conformity with the other provisions of the act. A physician not acting in good faith in the course of professional practice or research is not in conformity with the other provisions of the act.

We find the defense of entrapment was not established.

The decision of the Court of Appeals is affirmed.

COLEMAN, C.J., and FITZGERALD and RYAN, JJ., concurred with WILLIAMS, J.

LEVIN, J. *(to reverse Court of Appeals and affirm circuit judge).* Elvis S. Alford, a physician, was charged with violating § 41 of the Controlled Substances Act of 1971.[1] The circuit judge quashed the information on alternative grounds. The Court of Appeals reversed. We would reverse the Court of Appeals and affirm the quashing of the information.

A physician, or other registrant under the act, is not immune from prosecution under § 41 simply because he is a registrant. When a physician delivers drugs, not as a physician, but as a pusher, he is subject to prosecution.

This proper standard for determining responsibility under § 41 is the subjective standard of whether the physician has in good faith dispensed or prescribed for a medical purpose. The prosecution must show that the physician did not dispense or prescribe in good faith for what he perceived to be a medical purpose. Evidence of a non-medical purpose must be adduced.

We would affirm the quashing of the informa-

---

[1] MCL 335.341; MSA 18.1070(41).

tion on the ground that the judge did not clearly err in finding entrapment.[2]

# I

Registration under the act does not confer immunity from prosecution under § 41.

Persons who deal with controlled substances in certain capacities must register and may then lawfully possess, manufacture and deliver drugs in their authorized capacities. A physician registers as a physician and is implicitly authorized to dispense or prescribe drugs in the exercise of his profession for medical purposes. A physician's registration does not, however, authorize distribution of controlled substances for no medical purpose whatever.

It does not follow that because a physician may not traffic in drugs he can be prosecuted for simple departures from generally accepted standards of professional practice and ethics. Doctors not infrequently prescribe for patients who are not in their office, whom they have not examined, and over the telephone. Carelessness, bad judgment or malpractice is one thing; intent to traffic in drugs and

[2] Alford was charged with two counts of unlawful delivery under § 41. The first count concerned prescribing 120 amphetamine capsules, the second, dispensing 103 barbiturate capsules. It was charged that Alford dispensed and prescribed these drugs outside "the course of [his] professional practice".

The circuit judge granted the motion to quash on the following grounds: (1) Alford's acts did not constitute delivery under § 41, (2) the statute "either frees licensed physicians, without qualification, to hand out barbiturate drugs, or it permits them to hand out such drugs to people who come to their offices for professional consultation regardless of whether the physicians' conduct falls short of the standards of skill, care and ethics customarily employed by their co-professionals", and (3) Alford was entrapped.

The Court of Appeals reversed, holding that physicians are subject to prosecution under § 41 for prescribing and dispensing and that Alford was not entrapped.

distributing in bad faith for a non-medical purpose is quite another.

In *People v Downes,* 394 Mich 17, 33; 228 NW2d 212 (1975), a case decided under the prior controlled substances act, this Court declared that "[t]he instructional focus under such law must always be upon defendant's state of mind". A physician may prescribe drugs carelessly, hastily or over-zealously, but he does so as a physician, albeit a poor one, as long as he acts in a good-faith belief that he is doing so for a medical or professionally recognized purpose. It is only when this subjective good-faith intent is lacking that he exceeds the privilege of his registration, acts outside the scope of his profession, and criminal intent may be found.

II

The Court has adopted an objective test of entrapment, focusing on the propriety of the police conduct rather than the defendant's predisposition to engage in the proscribed activity. *People v Turner,* 390 Mich 7; 210 NW2d 336 (1973).[3]

Whether a defendant was entrapped is a question for the judge:

_____

[3] The prosecutor argues that because the police conduct occurred in March, 1973 and *People v Turner,* 390 Mich 7; 210 NW2d 336 (1973), was not decided until September of that year, the objective test should not be applied in this case.

The motion to quash was heard after *Turner* was decided. In *People v D'Angelo,* 401 Mich 167; 257 NW2d 655 (1977), and *People v Sheline, id.,* the judges submitted the entrapment issue to the jury. In *Sheline* the Court of Appeals reversed, holding that under *Turner* the entrapment issue should have been decided by the judge and not the jury. In *D'Angelo* the judge granted a new trial for the same reason. This Court declared: "Since the trials in both of these cases took place well after the *Turner* decision, we affirm the Court of Appeals conclusion that the trial courts erred in submitting the issue of entrapment to the respective juries." *People v D'Angelo, supra,* p 177.

It is the date of trial that is determinative, not of police conduct.

"In deciding the entrapment question the trial court should make specific findings of fact. Should the trial court find the claim of entrapment to be proved, the related charge will be dismissed. If the court finds the claimed entrapment not proved, the prosecution will proceed.

"The trial court's finding will be subject to appellate review under the clearly erroneous standard." *People v D'Angelo*, 401 Mich 167, 183; 257 NW2d 655 (1977).

The circuit judge applied the *Turner* test and made specific findings as required by *D'Angelo*.[4]

We have, in accordance with *D'Angelo*, reviewed

---

[4] The circuit judge found:

"Applying the objective standard to the facts in question, we have a situation in which entrapment has occurred. A law officer sought out the defendant for the purpose of causing the defendant to commit a crime in such a way as to furnish the officer with the evidence thereof. The defendant did not seek out or solicit the police officer to engage in illicit business.

"The police officer misrepresented himself as a patient and, after a cursory physical examination and history-taking, he obtained the prescription of a controlled substance.

"Thereafter, he made some seven or eight separate return visits, winning the confidence of the physician, more and more, with each visit. On each visit the officer asked the physician to do things which the officer believed to be criminal in nature.

"The officer offered to sign his name and other names in the book of account which the physician kept respecting controlled substances.

"The officer told the physician that he was not selling or profiting from the drugs furnished or prescribed by the physician.

"He prevailed on the physician to prescribe amphetamines for a fictitious overweight wife and to prescribe controlled substances for fictitious friends.

"No one is claiming that the physician violated the law by his handing out and prescribing controlled substances on the officer's first visit. Nor is the evidence sufficient to show that, at the time of the first visit, the doctor was ready, willing and able to commit the offense of unlawful delivery or unlawful prescription. The first visit was designed to gain the doctor's confidence, allay his suspicions and 'to soften him up' for future importuning. The officer persisted in a repeated course of conduct after the first visit which was calculated to induce and instigate the commission of an offense which would not have occurred but for the officer's persistent, clever, persuasive, and deceptive efforts. The officer did more than to merely provide an opportunity for the commission of a crime. He generated and manufactured some allegedly criminal conduct which would not have occurred without his earnest, energetic and persistent efforts."

those findings by the clearly erroneous standard, and cannot say that we are "left with the definite and firm conviction that a mistake has been committed". *Tuttle v Dep't of State Highways,* 397 Mich 44, 46; 243 NW2d 244 (1976).

As the circuit judge found, the officer did make eight or nine visits to Alford before the alleged unlawful delivery. Alford did ask if he was selling the drugs; the officer denied that he was. The officer did tell Alford that his wife was overweight and therefore needed similar prescriptions.

The officer made eight or nine visits to Alford for the sole purpose of encouraging him to commit a crime. The circuit judge, thus, did not err in finding that "[t]he officer persisted in a repeated course of conduct after the first visit which was calculated to induce and instigate the commission of an offense which would not have occurred but for the officer's persistent, clever, persuasive, and deceptive efforts".

We would reverse the Court of Appeals and affirm the circuit judge's quashing of the information.

KAVANAGH, J., concurred with LEVIN, J.

KAVANAGH, J. (to reverse the Court of Appeals and affirm circuit judge). I have signed Justice LEVIN's opinion because I concur that the trial court's conclusion regarding entrapment is not clearly erroneous.

I write separately, however, to mark my disagreement with the implication in Part I that this statute as written in 1971 can constitutionally be applied to physicians.

I am satisfied that if we would observe the standard we have recognized since 1918: "A crimi-

nal statute ought to be so plain and unambiguous that 'he who runs' may read, and understand whether his conduct is in violation of its provisions." *People v Ellis,* 204 Mich 157, 161; 169 NW 930 (1918); *People v Downes,* 394 Mich 17, 25; 228 NW2d 212 (1975), we would conclude that this statute as applied to physicians is too vague to pass constitutional muster.

BLAIR MOODY, JR., J. *(concurring in part, dissenting in part).* I concur with the analysis and result reached in Part V of the opinion for affirmance of Justice WILLIAMS, *i.e.,* the entrapment issue. I dissent in regard to Parts III and IV of that opinion.

The appellant, Dr. Alford, was charged in an information with two counts of unlawful delivery of a controlled substance. MCL 335.341(1)(b); MSA 18.1070(41)(1)(b). The first count defines the unlawful delivery as the writing of a prescription for 120 capsules containing amphetamines. The second count defines unlawful delivery as the actual dispensing by the doctor of 103 capsules containing barbiturates.

Inherent in the very wording of the information are the presumptions that prescribing and dispensing can be equated with "delivery" under the Michigan Controlled Substances Act (1971 PA 196, MCL 335.341; MSA 18.1070[41]), and that a registered physician can be prosecuted for unlawful delivery under the act. We think not.

## INTRODUCTION

In order to put the facts of the instant case in perspective, it is essential to set out the various relevant sections of the Controlled Substances Act of 1971. The basic penalty provisions of the act are

found in §§ 41, MCL 335.341; MSA 18.1070(41) and 42, MCL 335.342; MSA 18.1070(42).

Section 41 provides in pertinent part:[1]

"(1) Except as authorized by this act, it is unlawful for any person to manufacture, deliver or possess with intent to manufacture or deliver, a controlled substance. Any person who violates this subsection with respect to:

\* \* \*

"(b) Any other controlled substance classified in schedules 1, 2, or 3, except marihuana, is guilty of a felony and upon conviction may be imprisoned for not more than 7 years or fined not more than $5,000, or both."

On the other hand, § 42 provides in pertinent part:

"(1) It is unlawful for any person:

"(a) Who is subject to chapter 3,[2] to distribute, prescribe or dispense a controlled substance in violation of section 38.[3]

\* \* \*

---

[1] We note at the very outset that § 41 does not include the word "dispense" among the unlawful activities proscribed. This may be contrasted with the similar provision under the Federal Controlled Substances Act, 21 USC 841(a)(1), which makes it

"unlawful for any person knowingly or intentionally—

"\* \* \* to manufacture, distribute, or *dispense,* or possess with intent to manufacture, distribute, or *dispense* a controlled substance". (Emphasis added.)

Since the Michigan act is modeled directly on the Federal act, it is of critical significance that the Michigan Legislature chose to delete the word "dispense" from those acts forbidden by § 41.

[2] Chapter 3, MCL 335.331 *et seq.;* MSA 18.1070(31) *et seq.,* sets out the general provisions regarding registration and who must be registered under the act and control of manufacture, distribution and dispensation.

[3] Section 38, MCL 335.338; MSA 18.1070(38), sets out the general rules for prescription, distribution and dispensation by a practitioner.

"(2) Any person who violates this section may be punished by a civil fine of not more than $25,000.00 in a proceeding in the circuit court. However, if the violation is prosecuted by a criminal indictment which alleges that the violation was committed knowingly or intentionally, and the trier of the fact specifically finds that the violation was committed knowingly or intentionally, such person is guilty of a misdemeanor and upon conviction may be imprisoned for not more than 2 years or fined not more than $25,000.00, or both."

Further, the act provides specific definitions of terms which must be viewed in conjunction with the penalty provisions:

1. " 'Deliver' or 'delivery' means the actual, constructive or attempted transfer from 1 person to another of a controlled substance, whether or not there is an agency relationship." MCL 335.304(1); MSA 18.1070(4)(1).

2. " 'Dispense' means to deliver or issue a controlled substance to an ultimate user or research subject by or pursuant to the lawful order of a practitioner, including the prescribing, administering or compounding necessary to prepare the substance for that delivery or issuance." MCL 335.304(2); MSA 18.1070(4)(2).

3. " 'Person' means an individual, corporation, government or governmental subdivision or agency, business trust, estate, trust, partnership or association, or any other legal entity." MCL 335.307(1); MSA 18.1070(7)(1).

4. " 'Practitioner' means:

"(a) A physician, dentist, veterinarian or pharmacist as defined in subdivisions (o), (p), (q) and (w) of section 1 of Act No. 151 of the Public Acts of 1962, as amended, being section 338.1101 of the Compiled Laws of 1948, scientific investigator as defined by rule of the administrator, or other person licensed, registered or otherwise permitted to distribute, dispense, conduct research with respect to or to administer a controlled substance in the course of professional practice or research in this state." MCL 335.307(3); MSA 18.1070(7)(3).

These provisions taken together provide the backdrop for our discussion.

## Discussion

Our outline of the pertinent sections of the Michigan Controlled Substances Act and even a cursory reading of the remaining provisions of the act makes one thing perfectly clear: there is little clarity in this circuitously woven piece of legislation. In this morass, however, we do find certain things that do stand out.

In the instant case defendant physician was charged with unlawful "delivery" of a a controlled substance by "prescribing" certain amphetamines and by "dispensing" certain barbiturates. Unlike the Federal statute, the Michigan definitional section encompassing delivery does not include the word "dispensing".[4] While the Michigan legislation was clearly modeled after the Federal legislation, it is very significant that the Michigan Legislature chose not to include the word dispensing or its corollary, prescribing, in the definition of delivery. It indicates an intent upon the part of the Legislature not to equate the term delivery with the terms dispensing or prescribing.

This position is further bolstered by the fact that the Legislature set forth one statutory provision regulating the delivery of drugs and another statutory provision regulating the dispensing and prescribing of drugs. Section 41 governs prohibitions for unlawful delivery under the act, while § 42 contains restrictions on dispensing and prescribing.

Since the Legislature delineated separate sections and differing rules for delivery and dispens-

---

[4] See footnote 1, *supra.*

ing, it is evident that the Legislature did not equate the two. Had the Legislature intended to subject doctors to liability under both §§ 41 and 42, they could have said so plainly. Their failure to so indicate leads us to conclude that the Legislature did not intend a dual liability for doctors under the statute.

Our interpretation of the Legislature's intent may be underlined by recent legislative amendments to the Michigan Controlled Substances Act. In 1978 PA 147 the Legislature amended Section 41 to read as follows:

"(1) Except as authorized by this act, a person shall not manufacture, deliver, or possess with intent to manufacture or deliver, a controlled substance. A practitioner registered by the administrator under this act shall not dispense, prescribe, or administer a controlled substance in a manner which is not for legitimate medical or therapeutic purposes and which is not in the course of the practitioner's professional practice." MCL 335.341; MSA 18.1070(41).

Since § 42 remains virtually intact under the new amendments, it is obvious that the Legislature now intends that practitioners, including doctors, can be liable under both sections of the act.[5] It is noted, it could be said that the "new" amendments are not so much new as they present a clarification of what the Legislature intended all along.

We think there is a better view. It is our position that the Legislature in its original enactment did not intend to cover doctors under § 41; but

_____
[5] This last statement must be read with some caution. While it is clear that the newly amended § 41 encompasses both "delivery" and "dispensing" under its definitional mantle, it is less than clear whether the subdivisions which outline what is prohibited under § 41 apply to both unlawful delivery and unlawful dispensing. However, since this question is not before the Court, we take no position on it.

with its recent enactment the Legislature has changed its view. Support for our position rests in the notion that if the Legislature had intended mere clarification and, therefore, retroactive application, the Legislature would have said so. It did not; thus, the amendment must be viewed as a total change and a complete abrogation of the old view.

Further, we are cognizant of the fact that our conclusion seems to run contrary to that of the United States Supreme Court in *United States v Moore,* 423 US 122; 96 S Ct 335; 46 L Ed 2d 333 (1975). However, we have already pointed out that there are significant differences between the Michigan Controlled Substances Act and the Federal Controlled Substances Act, which was interpreted in *Moore.*

In addition, we are also aware that at least three other jurisdictions have declined to follow *Moore* and have found that physicians and other registrants are not subject for violations similar to those presented in the instant case.[6] Of particular relevance is the poignant statement of the Texas Court of Criminal Appeals in *Haney v State,* 544 SW2d 384 (Tex Crim App, 1976):

"Obviously 'dispense' is a special and limited means of delivery provided by statute and would control over the broad general definition of 'delivery,' which relates to the transfer, actual or constructive, of a controlled substance. 'Dispense' relates to those instances where dispensing is pursuant to the lawful order of a practitioner. * * * [I]t can readily be seen that 'dispense' has

---

[6] See *State v Best,* 292 NC 294; 233 SE2d 544 (1977); *Haney v State,* 544 SW2d 384 (Tex Crim App, 1976); *McLean v State,* 527 SW2d 76 (Tenn, 1975). While the *McLean* decision involved a pharmacist and preceded *Moore* by several months, its analysis was similar to that of the *Best* and *Haney* courts and to the analysis we employ in the instant case.

a separate and distinct meaning from 'delivery' for purposes of the Act." *Haney, supra,* 388, fn 1.

"We are not unaware of the decision of *United States v Moore,* * * * that registered physicians may be prosecuted for violation of the Federal Controlled Substances Act * * * when their activities fall outside the usual course of professional practice. However, because of the difference in language of the Federal and State statute, the decision is distinguishable from the instant case." *Haney, supra,* 388.

*Moore* is also distinguishable on another important level. In our analysis of the Michigan Controlled Substances Act, we find no standard by which to measure the culpability of a physician.

Under the Michigan act, physicians and other registrants clearly possess an exemption from prosecution. This exemption is found in chapter 3, MCL 335.332(2); MSA 18.1070(32)(2), which reads:

"Persons registered by the administrator under this act to manufacture, distribute, prescribe, dispense or conduct research with controlled substances may possess, manufacture, distribute, prescribe, dispense or conduct research with those substances to the extent authorized by their registration and *in conformity with the other provisions of this chapter."* (Emphasis added.)

It has been argued that this § 32 exemption is specifically limited by language in chapter 1, § 7, which defines a practitioner:

" 'Practitioner' means:

"(a) A physician, dentist, veterinarian or pharmacist as defined in subdivisions (o), (p), (q) and (w) of section 1 of Act No. 151 of the Public Acts of 1962, as amended, being section 338.1101 of the Compiled Laws of 1948, scientific investigator as defined by rule of the administrator, or other person licensed, registered or otherwise permitted to distribute, dispense, conduct research with

respect to or to administer a controlled substance *in the course of professional practice* or research in this state." (Emphasis added.) MCL 335.307(3); MSA 18.1070(7)(3).

According to that argument, physicians must act "in the course of professional practice" to retain their limited exemption.

The limiting argument is patently faulty for three reasons. First, the exemption language found in chapter 3, § 32 applies as long as the registrants' actions are "in conformity with the other provisions of this chapter". Thus, any limitation on the exemption must be found in chapter 3, not chapter 1 where the definition of practitioner is found.

But even if this were not the case, there is a second reason found in the very wording of the definition of practitioner which casts doubt on whether that language was intended to limit the exemption in § 32. The phrase "in the course of professional practice" occurs at the very end of the statutory definition of practitioner. It is arguable that that phrase was intended to modify all the particular persons defined as practitioners within the section.

There is a better position, however. Since the phrase appears fully 65 words after the word "physician", it was not intended to modify physician but only the clause which immediately preceded it, that being "or other person licensed, registered or otherwise permitted to distribute, dispense, conduct research * * * or to administer a controlled substance".

Although both interpretations are plausible we are compelled to accept the latter one, *i.e.,* the phrase did not intend physician as its antecedent. This is so because of a basic hornbook rule in

criminal law that a criminal statute should be strictly construed in favor of the accused.

There is a third reason even more compelling than the first two for rejecting the argument that the phrase "in the course of professional practice" forms a limitation on the physician registrant's exemption. The phrase is vague in and of itself, neither connoting an objective standard of culpability nor a subjective standard of culpability.

This Court in *People v Downes,* 394 Mich 17; 228 NW2d 212 (1975), considered a conviction for violation of the Uniform Narcotic Drug Act, MCL 335.51 *et seq.;* MSA 18.1071 *et seq.,* the predecessor of the Michigan Controlled Substances Act. The facts of *Downes* were that a doctor was charged with and convicted of prescribing certain narcotic drugs to known addicts. The conviction rested on § 7 of the act which read in pertinent part:

"(1) A physician or dentist, *in good faith and in the course of his professional practice only,* may prescribe, administer, and dispense narcotic drugs * * *." (Emphasis added.) MCL 335.57; MSA 18.1077.

Defendant Downes argued that "good faith" as limited by the words "in the course of his professional practice" must present an objective standard of culpability.

This court rejected defendant's argument. Justice FITZGERALD, writing for a unanimous Court, said:

"The interjection of the modifying terms 'in the course of his professional practice' into the statutory formulation does not change the obvious and clear import of 'good faith' in the absence of express manifestation of legislative intention indicating such change.

Moreover, to construe the statute as defendant would have us construe it would be to acknowledge that the statute may measure criminality by lack of conformity to professional standards which are not set forth in cognizable form in the statute itself. The source of such standards is unclear and, indeed, the standard of 'proper' professional conduct is the subject of considerable dispute within the profession * * *. Such a construction would necessarily require a finding of unconstitutionality." *Downes, supra,* 26-27.

Therefore, the phrase "in the course of professional practice" in the Michigan Controlled Substances Act creates no standard by which to measure a physician's culpability. It suggests neither an objective standard nor a subjective standard. This nebulous phraseology is therefore fatally defective.

## CONCLUSION

While we do not condone what we view as the reprehensible conduct of defendant doctor in the present case, we hold that the terms prescribing and dispensing cannot be equated with the term delivery under the Michigan Controlled Substances Act and that a registered physician cannot be prosecuted for unlawful delivery under the act of 1971. We, therefore, reverse the Court of Appeals and reinstate the judgment of the trial court quashing the information.